SADIE ROEH, Administratrix of the Estate of Albert Roeh, Appellee, v. BUSINESS MEN'S PROTECTIVE ASSOCIATION of Des Moines, Iowa, Appellant.

Accidental insurance: EVIDENCE OF ACCIDENTAL DEATH. To satisfy the
1  provision of an accidental insurance policy, that the association should not be liable for an injury or death caused by the discharge of a firearm, unless the accidental character thereof be established by the testimony of one eye witness other than the insured, it is not necessary that the witness should have seen the exact manner of the discharge of the firearm, but does comprehend the presence of the witness at or near the scene, and his direct observation of the facts and circumstances which of themselves indicate that the shooting was accidental, without the aid of any presumption arising from the instinct of self-preservation. Evidence held insufficient to establish the accidental shooting of deceased.

Same: CONTRACTS: PUBLIC POLICY. The foregoing provision in the
2  contract of insurance was not so repugnant to public policy, in that it attempts to modify or control the procedure of the courts, as to render the same invalid.

*Appeal from Jackson District Court.*—HON. M. F. DONEGAN, Judge.

THURSDAY, FEBRUARY 19, 1914.

ACTION upon a benefit certificate in the defendant association. The defendant denied liability upon grounds which will be referred to in the body of the opinion. The case was tried to the court without a jury, resulting in a judgment

for plaintiff for the amount of the certificate, with interest, and defendant appeals.—*Reversed.*

*Dunshee & Haines,* for appellant.

*Charles M. Thomas* and *G. E. Hilsinger,* for appellee.

DEEMER, J.—The defendant is a mutual assessment accident association incorporated under chapters 7 and 8 of title 9 of the Code of Iowa. As such, on the 21st day of March, 1912, it received an application from one Albert Roeh for membership in the association. The application contained a statement that the insured would accept the certificate issued by the association ''subject to all the conditions, provisions and limitations contained in defendant's articles and by-laws.'' The application was accepted, and a certificate was issued to and accepted by the insured on March 30, 1912. It provided certain indemnities in case of injury or death resulting from accident. No beneficiary is designated, but the articles provided that the indemnity should be paid to a surviving wife or heir of the member. On July 26, 1912, the insured came to his death as a result of the discharge of a rifle; whether the discharge was accidental or with suicidal intent does not clearly appear. This action was commenced by the administratrix of his estate to recover the benefits and indemnity of $1,000, in case of death by accidental means. Defendant introduced many defenses, and the case was tried on a stipulation of facts, supplemented by certain oral testimony.

Among other things it was stipulated in the certificate of membership that:

The articles of incorporation and by-laws may be changed by amendments legally adopted, and the rights of the member to claim benefits or indemnity shall be determined by the provisions of the articles and by-laws in force at the time a claim arises. Acceptance. I hereby accept this certificate of mem-

bership subject to all the provisions, conditions and limitations of the articles of incorporation and by-laws, and agree that both myself and my beneficiary shall be bound by future amendments legally adopted; and also subject to the terms and conditions hereinbefore set out, and I agree that the articles of incorporation, by-laws, my application and this certificate shall jointly constitute the contract between myself, my beneficiary and the association.

The articles of incorporation provided that:

The association shall pay to the beneficiary designated in writing by any member of the accident department, who must be either the surviving wife or an heir of such member, the proceeds of one full assessment on each member of the accident department in good standing at the time of the accident, to an amount not exceeding the sum specified in his certificate for indemnity on account of the death of any member of the accident department occurring within ninety days from the happening of the accident and resulting directly and without intervening cause from a bodily injury sustained by the member while in good standing and effected solely by external, violent and accidental means, subject only to the conditions, provisions and limitations of the by-laws.

Article 5, Section 14. The right of any member or person claiming by, through and under any certificate issued to any member to claim weekly benefits or indemnity from the association, shall be fixed and established by the provisions of the articles of incorporation and of the by-laws in force at the time the accident occurred or sickness commenced out of which any claim arises.

And the by-laws had these, among other provisions:

Article 1, Section 3. The contract between the association and its members shall consist of the articles of incorporation and by-laws and the application and the certificate of membership.

Article 4, Section 5. This association shall not be liable for the payment of benefits or indemnity on account of disability or death resulting from a bodily injury caused by the discharge of firearms unless the member or person claiming

by, through or under any certificate issued to such member shall establish the accidental character of such discharge by the testimony of at least one person other than the member who was an eye-witness of the event.

The only oral testimony as to the manner of death, we here quote:

Plaintiff testified:

I had some talk with my husband about noon on the day of his death over the telephone. He wanted to know what kind of meat I wanted for dinner, and said he would be down in a short time. That was somewhere between 12:30 and 1 o'clock. I heard of his death about 1:30 the same day.

Another witness said:

I saw the body of Mr. Roeh on the 26th day of July, 1912, after he was dead. I was called in there by Mr. Anderson. I found the body in the revolving chair with his head against the wall and his rifle at his left side on the floor. The ramrod was across his knees, and his legs were crossed. His right hand was hanging down, and his left hand was on his lap. The ramrod was an ordinary ramrod, about three feet long, with a crook on the end of it, and on the other end of it there was a rag for cleaning the gun. The rag was a little black from the powder from the gun. The rifle was a thirty-two magazine Winchester; the trigger being guarded by the lever which works up and down. The rifle was usually kept in the shop right at the desk where he was sitting. It was used for killing cattle; Roeh being in the butcher business. I do not remember how many days it was prior to this occurrence that they had killed cattle. I think it was two days, and that the supply of meat was low. I know Roeh had some cattle ready for killing out at a farmer's. I do not know whether he had any arrangements for killing them on that day. It was in the neighborhood of 1 o'clock when I saw the body in the chair. (Cross-examination.) Mr. Roeh was dead when I arrived. I did not hear the report of the rifle. I was called in there. (Redirect examination.) I did not know that Roeh was dead until after the doctor had been there. That was about ten minutes after I first saw him. I did not examine him to see if he was dead.

And another gave the following testimony:

I was working for Mr. Roeh in the butcher shop the day he was killed. I had a talk with Mr. Roeh about 12 o'clock on that day. He picked up the rifle and said: 'I don't believe this rifle has been cleaned out for ten years; it is so dirty.' Then he told me to get my dinner and come back to the barn and get the horses and wagon, and get back as early as possible, as we had a big afternoon's work ahead of us. I left the shop right at 12 o'clock or close to it, and it was about 1 when I got back. When I got back I stood on the sidewalk holding the team and hollered two or three times for him to come out. When he did not come, I tied the horses and went through the shop. I called as I went in, but got no answer. I glanced into the office and saw him in the chair. He was sitting in the revolving chair with his head back against the partition. I did not stop to look further, but ran out and called Mr. Goose and Mr. Peterson. (Cross-examination:) I think Mr. Roeh was dead when I first saw him. I did not hear the rifle shot. I was not present when the shooting took place. Nobody else was present that I know of or ever heard of. Our town is about 1,200 population, and I never have heard that anybody was there. Nobody ever heard the shot. Nobody saw or heard the shooting.

And the last and only other witness said:

I am the person who was called by Mr. Anderson the day on which Roeh was killed. When I got in, I found the body sitting in the revolving chair with the head leaning back against the wall, the rifle to his left side, his legs crossed, and the ramrod across his right foot. The muzzle of the gun was pointing south. He was sitting facing north. The ramrod had a rag on it, and it appeared to be a little black from running through the gun. That is all I know. (Cross-examination:) I was not present at the time of the shooting, and I did not see it. So far as I ever heard of no one heard the shot.

The defendant insisted, and still contends, that there can be no recovery under this record for the reason that there was

no eye-witness to the shooting other than the member himself. On the other hand, it is argued for appellant that there is such testimony as the policy requires, and, in any event, that the provisions of the articles and by-laws on which defendant relies are contrary to public policy, null and void, because they undertake to make a rule of evidence and interfere with the orderly procedure of courts of justice. Upon the first proposition plaintiff contends that the by-law requiring testimony of at least one person other than the member, who was an eyewitness of the event, does not necessarily mean that this other person should have been present and actually have seen the shooting; that the event includes all matters and circumstances leading up to and following the discharge, provided these be sufficient to show the nature of the discharge of the gun.

I. The event referred to in the by-law relied upon is manifestly death resulting from a bodily injury caused by the discharge of firearms, and provides that the independent testimony should come from one who was an eyewitness of that event. The objects and purposes of this rule or by-law are clear. It was to remove the presumption of accident arising from death as a result of a gunshot wound, and to require eyewitnesses of the event in order to establish liability on the part of the insurer. Not only is the beneficiary to prove the operating cause of death, as that it was from a gunshot wound; but he must prove by eyewitnesses of the event that the gun was accidentally discharged. It is not enough that he prove that it might have been so committed. His proof must be stronger than that, and fairly preponderate in favor of the proposition that the gun was accidentally discharged. The clause which we are now considering is quite different from any that have heretofore been before the courts. The nearest approach to it seems to be found in *National Acc. Society v. Ralstin*, 101 Ill. App. 192. In that case the insured was injured by the discharge of a gun, and gave testimony as to the manner of the

1. ACCIDENTAL
INSURANCE:
evidence of ac-
cidental death.

discharge. It was held that, as the plaintiff was an eyewitness of his own injury, the provision of the certificate issued by the company was complied with. *In Lewis v. Brotherhood,* 194 Mass. 1 (79 N. E. 802, 17 L. R. A. (N. S.) 714), the provision of the policy was as follows:

In the event of any accidental bodily injury, fatal or nonfatal, contributed to or caused by  .  .  .  drowning or shooting, when the facts and circumstances of the accident and injury are not established by the testimony of an actual eyewitness,  .  .  .  then and in every such case the limit of the liability of this company hereunder shall be one-twentieth of the accidental death benefit provided for in this policy not to exceed $250 for accidental death, and for nonfatal injuries causing total or partial disability, one-fifth of the weekly indemnity provided for in this policy.

It will be noticed that the facts and circumstances of the accident and injury were to be established by an eyewitness, and the court held that death by accidental drowning might be established by eyewitnesses of the facts and circumstances; in other words, that the accidental drowning might be established by circumstantial evidence.

In the case at bar the event, that is to say, the accidental character of the discharge of firearms resulting in death must be established by at least one person other than the insured, and "who was an eyewitness" does not necessarily mean that the witness should have seen the exact manner of the discharge; but it seems to us that it does comprehend the presence of the witness at or near the scene and his direct observation of such facts and circumstances connected with the immediate transaction, as of themselves, and without any aid from presumption or inference arising from love of life, or the instincts of self-preservation, indicate that the shooting was accidental. The following quotation from the Lewis case, *supra,* indicates our thought in the matter:

An eyewitness is a person who testifies to what he has seen. By the terms of this policy the facts and circumstances

of the accident and injury are to be established by those who saw them. Not only are the facts and circumstances of the injury to be established by an eyewitness, but also of the accident; that is, the operating cause of the injury. Enough must be testified to by eyewitnesses to show the operating cause of the injury, or at least to show that at the time of the injury there was an operating cause to which the accident may fairly be attributed, and to indicate in a general way the nature of that cause and the manner of its working. To illustrate: Suppose a person standing upon the shore sees not far out a boat sailing peacefully along in a mild breeze, with a competent and careful man at the helm. The boat is so large and steady that it is not likely to be capsized by any movement that the man would make, nor by the wind as then blowing. In no sense can the boat be said to be in then present peril from any cause. Suppose the observer leaves the shore and returns in an hour, and then sees the upturned boat near where he first saw it. During his absence an accident has happened resulting in the upsetting of the boat. Can it be said that he has seen the circumstances of the accident within any fair interpretation of the language? He has seen no cause in operation to which the accident may be fairly attributed. But suppose that when he first sees the boat, or while he is looking at it, a squall suddenly looms up in the distance and rapidly approaches the boat. He sees it strike the boat, putting her in evident peril. Wanting to get a better look, he runs to a house for a spyglass, is gone only a few minutes, and when he returns sees only a capsized boat. Such a man is an eyewitness of the accident, although he did not actually see the boat capsize. He saw the boat in peril from a then impending cause. He saw the cause at work, and saw what was the natural effect of such a cause. That is far enough; and in such a case the cause of the accident must be held to have been established by an eyewitness within the meaning of the policy.

In the instant case no one heard the shot, although it must be conceded under the record that insured died as a result of a rifle shot. Leaving out all presumptions and inferences as to the nature of the operating cause, the proof adduced would in itself be insufficient, as we think, to show (by eyewitnesses) that the gun was accidentally discharged. Not

only was the burden upon the plaintiff to show that the gun .was accidentally discharged; but she had to do this by eye-witnesses of the event, and that event was, of course, the discharge of the gun.

If the by-law is good, we think plaintiff has failed to make out a case.

II.   It is contended that the by-law is contrary to public policy, in that it attempts to modify and control the procedure of courts of justice. It does not in any manner deprive courts of their jurisdiction, but simply provides a rule of evidence or a condition precedent or subsequent to a right of recovery.   We see nothing in the by-law contrary to public policy.   Contracts relating to procedure have frequently been sustained.   The parties may, by contract, fix their own statute of limitations. See *Harrison v. Insurance Co.*, 102 Iowa, 112.   They may also specify the terms and conditions of liability, even though, without the contract, recovery might be had.   *Griswold v. Railroad*, 90 Iowa, 265.   A contract may be made, waiving a jury trial.   *Columbia Bank v. Okely*, 4 Wheat. 235 (4 L. Ed. 559).   A by-law much like the one now before us was applied in *National Ass'n v. Ralstin*, 101 Ill. App. 192; *Kelly v. Supreme Council*, 46 App. Div. 79 (61 N. Y. Supp. 394). A contract providing a rule of evidence was also upheld by this court in *Russ v. The War Eagle*, 14 Iowa, 363.

2. SAME: contracts: public policy.

The Legislature has not spoken upon this subject, and, until it does so, we see nothing inimical to public policy in the by-law now before us.

For the reasons pointed out, the judgment must be, and it is, *Reversed.*

LADD, C. J., and GAYNOR and WITHROW, JJ., concurring.