## L. E. Ellis, Administrator, Appellee, v. Interstate Business Men's Accident Association, Appellant.

**INSURANCE:** Accidental Injuries—Insurer as Final Arbiter. A policy which provides that the insurer shall not be liable for injuries from the discharge of firearms unless the accidental character of the discharge shall be established by at least one eyewitness of the event, other than the insured, "provided * * * the directors may waive this limitation when they are satisfied that said discharge was accidental," simply means that there shall be no liability if the directors, as *reasonable* men, and acting *reasonably,* find that the accidental nature of the discharge has not been established. And the insurer may not constitute himself the *supreme arbiter* of this fact question.

**INSURANCE:** Accident—Res Gestae, Etc. The *res gestae* attending an injury and the condition of matters and things relating thereto, without any direct evidence as to what took place at the very instant of time when the injury was received, may be sufficient to establish, to a reasonable certainty, the accidental character of the injury.

PRINCIPLE APPLIED: An automobile was out of repair. Deceased went to the garage to work upon it. Soon thereafter, he returned to his house for dinner. His conduct was not unusual. After dinner, he returned to the garage. Within two or three minutes, he, dressed in his overalls and with a wrench in his hand, hurriedly returned to the house, hurriedly called to 'his wife, and said: "I am hurt. I feel as if something hit me. I was reaching on the shelf for the grease gun, when something knocked me over. I think it must have been the 22. I didn't know it was there. Examine my side. I feel faint. I thought it was an electric shock, at first. I saw some smoking rags, the end of the rifle sticking out." The rifle in question was hammerless, was very easily discharged, was at once found in the garage on a shelf, under an aggregation of rags and tools, and with the muzzle angling outward and beyond the edge of the shelf. A rag, with a hole burned therein, was looped over the end of the barrel. A grease gun was present with the rags. There was no evidence tending to show suicidal purpose or predisposition to suicide. *Held* sufficient to establish the accidental discharge of the gun. .

**INSURANCE:** ''Eyewitness'' Requirement. An *"eyewitness,"* within the meaning of a policy which provides for non-liability in

case of injury from the discharge of firearms unless the accidental character of the discharge be established by an "eyewitness" of the event other than the insured, is (a) one who, having been present at or near the scene of the injury, testifies to the *operating cause* of the injury as then observed by him, or (b) one who, having been so present, testifies to the existence of an operating cause, as then observed by him, to which the accident may fairly be attributed, and who testifies, in at least a general way, to the nature and working of such operating cause.

PRINCIPLE APPLIED: See No. 2. *Held*, the accidental nature of the discharge of the gun was established by an "eyewitness."

*Appeal from Polk District Court.*—THOMAS J. GUTHRIE, Judge.

JUNE 27, 1918.

ACTION at law, to recover upon a policy of accident insurance. There was a judgment for plaintiff, and defendant appeals.—*Affirmed.*

*R. M. Haines,* General Counsel, and *Dunshee, Haines, & Brody,* for appellant.

*Carr, Carr & Evans,* for appellee.

WEAVER, J.—It is conceded of record that the plaintiff's intestate died March 14, 1916; that his death resulted from a gunshot wound, without any other concurring or contributing cause; and that, at the time of his death, he held a valid policy of accident insurance in the defendant association. Suit being brought on the policy, the defendant answered, denying liability on the theory that, although the death of the insured is shown to have been caused solely by external and violent means, proof of its accidental character is not established in the manner stipulated in the policy. It pleads that the deceased, in applying for membership in the association and for a policy of insurance therein, entered into the following agreement:

1. INSURANCE: accidental injuries: insurer as final arbiter.

"I hereby agree that I will accept the certificate of membership which may be issued to me, subject to all the provisions, conditions, and limitations contained in the articles of incorporation and by-laws of said association as the same now are or as they may be legally amended and changed; and I agree to comply with all the provisions thereof."

The answer further alleges that, among the provisions of the articles and by-laws of the association to which the deceased thus subscribed, are the following:

"The right of any member or person, claiming by, through and under any certificate issued to any member to claim weekly benefits or indemnity from the association shall be fixed and established by the provisions of the articles of incorporation and of the by-laws in force at the time the accident occurred or sickness commenced out of which any claim arises." Section 15 of Article V.

"The contract between the association and its members shall consist of the articles of incorporation and by-laws and the application." Section 3 of Article I.

"This association shall not be liable for the payment of benefits or indemnity on account of disability or death resulting from a bodily injury caused by the discharge of firearms, unless the member, or person claiming by, through or under any certificate issued to such member, shall establish the accidental character of such discharge by the testimony of at least one person, other than the member, who was an eyewitness of the event; *provided that the board of directors may waive this limitation when they are satisfied that said discharge was accidental.*" Section 5 of Article IV.

The accidental character of Larson's death is denied, and the sole contention of the defendant in the court below and in this court is that plaintiff has failed to establish that fact in the manner or by the testimony prescribed in Section 5, Article 4, last above quoted.

The testimony, in addition to the conceded facts already mentioned, is very brief. It tends to show that deceased and his wife had been out in an automobile, which did not appear to be working well, and they came home about four o'clock in the afternoon. The wife went into the house, and deceased went to work on the car. A little later, deceased came in to dinner, after which he returned to the garage. Of what followed, the wife, testifying as a witness, says that, within two or three minutes after he went out, she heard him come rapidly into the kitchen; and as he entered, he called to her, "Come here, Nita, quick. I am hurt." Going to him, she found him standing in the room. He was dressed in his overalls, and had a monkey wrench in his hand. To her inquiry, "How are you hurt?" he said:

"I feel as if something hit me. I was reaching on the shelf for the grease gun, when something knocked me over. I·think it must have been the twenty-two. I didn't know it was there."

Then, sitting down, he asked his wife to examine his side, and added that he was feeling faint. To the doctor, who soon arrived, he repeated his story, substantially as before. The wife, referring to the rifle, says it was a hammerless gun, which she had herself often used, and that the trigger pull was extremely light. The safety device was operated by slipping it to the side, and it would "slip with the slightest touch." In connection with the statement made by the injured man to the doctor, he said:

"I thought it was an electric shock, at first. It knocked me down. I got up, and saw some smoking rags or something of the sort; the end of the rifle sticking out."

This witness also examined the situation at the garage, and says:

"There is shelving along the north wall, occupying the east portion of the north wall, in the northeast corner of the garage. We found a twenty-two rifle lying on one of the

shelves. The butt end was against the east end of the shelf, and the rifle lying at an angle across the shelf. The muzzle stuck over the edge of the shelf two or three inches. The rifle was covered with some rags, and there was a tire pump lying on top of the gun, and some rags under the tire pump. There was a grease gun lying there, mixed up among the rags. The muzzle was sticking out, as you looked towards the shelves, and the wire plunger, with a loop for a handle, was in the debris on the shelf. These rags were apparently rags which had been used for wiping the car. There was a rag over the muzzle of the gun, with a hole burned through. The charred hole was two or three inches in diameter, and it allowed the rag to drop so that the muzzle of the gun stuck through the hole."

One other witness gives practically the same description.

The only evidence offered on the part of defendant was the several provisions of the articles and by-laws of the association, and the concession by plaintiff that they were in force and effect at the time of the injury and death of the insured.

At the close of the evidence, both parties moved for a directed verdict. The defendant's motion being overruled, its counsel said to the court, "That leaves nothing, I take it, but to direct a verdict for plaintiff;" and a ruling was entered accordingly. From the judgment on the directed verdict, the defendant has appealed.

I. The first question presented is the construction of the contract of insurance, with special reference to the effect upon such contract of Section 5, Article 4, of appellant's articles of incorporation, which section we have already quoted in full.

The appellant's position is that the case before us is, in all essential respects, the parallel of *Roeh v. Business Men's Assn.*, 164 Iowa 199, and that the rule there approved and

applied requires a reversal of the judgment entered in the trial court. We think, however, that there is a very clear and important distinction between the contract in the *Roeh* case and the one now to be considered. True, Section 5, Article 4, down to the beginning of the final clause, does follow the very language of the article in the *Roeh* case, but adds thereto the provision which we have italicized in the quotation, *"provided that the board of directors may waive this limitation when they are satisfied that said discharge was accidental."* Reading the entire article in connection with this final provision, it seems very clear that it was not intended to exempt the association from all liability for the death of a member from a gunshot wound where there is no eyewitness of the occurrence, but to limit such exemption to cases where the proof of the accidental character of the injury is not established by the evidence to the satisfaction of the directors. If this be not its meaning, what effect shall we give it? It must be presumed that the proviso means something, and surely it is not to be dismissed as a mere reservation by the insurer of a right to make the beneficiary of the policy a gift, if the board of directors shall be so charitably inclined. The language of the contract in this respect has been chosen by the insurer, and, under familiar principles, it is to be given the most favorable construction of which it is reasonably capable in support of the plaintiff's claim. It is well settled, also, that an insurer cannot constitute itself the final judge or arbiter of the merits of a claim made against it, by inserting in its policy a provision that any claim thereunder must be established by proof to its satisfaction. For example, in *Braunstein v. Accidental Death Ins. Co.*, 1 B. & S. 782, an English case, the policy provided that, before payment of the indemnity, proof satisfactory to the board of directors of the accidental character of the injury must be furnished; and it was there held that this must be

interpreted as meaning no more than that the proof must be reasonably satisfactory, and that the board could not deprive the plaintiff of his right to recover, by unreasonably refusing to be satisfied.   See, also, *Traiser v. Commercial Trav. E. Acc. Assn.*, 202 Mass. 292 (88 N. E. 901); *Insurance Co. v. Rodel*, 95 U. S. 232, 237; *Buffalo L., T. & S. D. Co. v. K. T., etc., Assn.*, 126 N. Y. 450; *Reynolds v. Equitable Acc. Assn.*, 59 Hun 13; *Insurance Co. v. Bennett*, 90 Tenn. 256; *Noyes v. Commercial Trav. E. Acc. Assn.*, 190 Mass. 171 (76 N. E. 665).   In the *Noyes* case, the Massachusetts court quoted the *Braunstein* case approvingly, and says:

"There is an implication that the directors will act reasonably, and the requirement is the same as if the words 'acting reasonably' were inserted, in connection with the words 'said board.'"

Speaking upon the same subject, the court, in the *Traiser* case, after holding that, upon the proofs offered, the jury might find that the death was accidental, adds:

"If the jury should so find, we are of opinion they would have also the right to say the same fair preponderance of the evidence which had convinced their judgments ought to have produced the same conviction in the minds of other reasonable men.   It would be an anomaly for us to decide otherwise.   It cannot be said, as a matter of law, that reasonable men were bound to come to only one conclusion.   It is not for the defendant, in a case of contradictory evidence, finally and decisively to pass upon the rights of the insured, if such a condition as this has been reasonably complied with."

In *Buffalo, etc., v. Association*, supra, it is said that a requirement of "satisfactory proof" entitled the association to demand that the fact "should be shown with reasonable definiteness and certainty."   The rule of these precedents is without exception in the cases, so far as we have been able to discover.   As suggested in the *Traiser* case, it would be

contrary to all reason and all sound principle to hold it competent for an insurer in a contract to clothe himself with power or authority "to pass finally and decisively upon the rights of the insured." The courts cannot thus be ousted of their jurisdiction to settle and adjudicate disputes involving rights of persons and property. *Lewis v. Brotherhood,* 194 Mass. 1; *Utter v. Travelers' Ins. Co.,* 65 Mich. 545; *Fidelity & Cas. Co. v. Crays,* 76 Minn. 450; *Fidelity & Cas. Co. v. Eickoof,* 63 Minn. 170.

II. Construing the contract as indicated in the preceding paragraph, we have, then, to inquire whether, upon the evidence produced, the jury could properly find that the accidental character of Larson's death had been established by proofs which "ought to satisfy reasonable men, acting reasonably."

2. INSURANCE: accident: *res gestae,* etc.

This question must be answered in the affirmative. The entire *res gestae* developed by the testimony tends strongly to show that the gun was accidentally discharged. There is not only an entire absence of evidence tending to show suicidal purpose or predisposition on part of the deceased, but practically every circumstance shown is consistent with and gives support to the opposite conclusion. That he had been engaged in working about his car is shown by the testimony of his wife, by the condition of things in and about the garage immediately after his injury, and by the fact that he had clothed himself in his overalls, or working suit. He had come into the house to his dinner; and, so far as appears, there was nothing in his conduct to excite the special notice or alarm of his wife. Dinner over, he returned to his work, but almost immediately,—in two or three minutes, the witness says,—he came back, in a hurried manner, carrying a monkey wrench in his hand, and calling his wife to come quickly, for he was hurt. His explanation given at the moment is clearly admissible evidence, and, if true, indicates that, in reaching for or taking down the "grease gun," with

which to lubricate some part of the car, he had moved the rifle lying upon the shelf, in such manner as to cause its discharge. His immediate and hurried return to the house, his prompt call for help from his wife and for medical aid, are quite inconsistent with an attempt at suicide. The fact that the rifle was found lying on the shelf or bench, with the muzzle angling outward, the delicate character of its trigger action, its being under a more or less confused aggregation of rags and implements used in caring for the car, and the further significant fact that the load appeared to have been discharged through a rag lying over its muzzle, all corroborate the story told by him as to the manner of his injury. That the proved facts and circumstances as a whole would justify a finding that the alleged accidental discharge of the gun was established to a reasonable certainty, and that the board of directors, as reasonable men, acting reasonably, should have so found, is scarcely open to doubt.

III. The foregoing considerations are sufficient to require an affirmance of the judgment below, without entering into any discussion as to whether, if we were to ignore the effect of the last clause of Section 5, Article 4, of the defendant's articles of incorporation, such judgment could be sustained. It is perhaps proper, however, to point out that the opinion in *Roeh v. Association,* supra, does not hold that, to satisfy the provision for "eyewitnesses" of the accident, some witness must be produced who actually saw the discharge of the gun which caused the injury. The rule or principle there approved is stated in these words:

3. INSURANCE: "eyewitness" requirement.

"The event referred to in the by-law relied upon is manifestly death resulting from a bodily injury caused by the discharge of firearms, and provides that the independent testimony should come from one who was an eyewitness of that event. * * * Not only is the beneficiary to prove the operating cause of death, as that it was from a gunshot wound,

but he must prove, by eyewitnesses of the event, that the gun was accidentally discharged. It is not enough that he prove that it might have been so committed. His proof must be stronger than that, and fairly preponderate in favor of the proposition that the gun was accidentally discharged. * * * In the case at bar, the event,—that is to say, the accidental character of the discharge of firearms resulting in death,—must be established by at least one person other than the insured, and 'who was an eyewitness' does not necessarily mean that the witness should have seen the exact manner of the discharge; but it seems to us that it does comprehend the presence of the witness at or near the scene, and his direct observation of such facts and circumstances connected with the immediate transaction as, of themselves, and without any aid from presumption or inference arising from love of life, or the instincts of self-preservation, indicate that the shooting was accidental."

Following this statement of the proposition, the opinion then quotes and adopts, as expressing the views of this court, an extract from *Lewis v. Brotherhood Accident Co.,* 194 Mass. 1.

"An eyewitness is a person who testifies to what he has seen. By the terms of this policy, the facts and circumstances of the accident and injury are to be established by those who saw them. Not only are the facts and circumstances of the injury to be established by an eyewitness, but also those of the accident; that is, the operating cause of the injury. Enough must be testified to by eyewitnesses to show the operating cause of the injury, or at least to show that, at the time of the injury, there was an operating cause to which the accident may fairly be attributed, and to indicate in a general way the nature of that cause and the manner of its working."

As will be readily seen, this statement of the rule is much less rigid and inflexible than the one contended for by

appellant. Perhaps no better illustration is needed than a
statement of the facts in the *Lewis* case, in which the court
announced the above rule, and permitted the plaintiff to re-
cover upon a policy containing a requirement of an eyewit-
ness of the event. One Lewis, being insured against ac-
cident, was drowned. The policy which he held contained a
provision that, in case the insured died by drowning or by
shooting, there could be no recovery against the insurer ex-
cept upon proof of the facts and circumstances of the ac-
cident and injury, by the testimony of an actual eyewitness.
It was shown that Lewis and a young lady were seen on the
river in a canoe which Lewis was paddling. A little later,
the empty canoe was found floating upon the river, and the
dead bodies of Lewis and his companion were thereafter
found in the river. No one saw the canoe upset, or saw
Lewis or the young lady struggling or alive in the water.
In other words, there was no living eyewitness of the im-
mediate facts of the drowning. There were, however, two
witnesses who were on the river about five minutes before
four o'clock in the afternoon of that day, and met Lewis and
the lady going in the opposite direction. They appeared to
be chatting and in good spirits, nothing unusual in their
manner, or in the appearance or action of the canoe. One
of these witnesses testified, also, that, three or four minutes
after this meeting, and after a point of land had intervened,
shutting the canoe and its occupants from his view, he heard
a cry or scream of some kind, but did not return to see what,
if anything, was the matter. Another witness, with a friend,
was on the river "about 4 o'clock" and, as they rounded a
bend, they came upon the upturned canoe, and discovered
articles of clothing floating on the surface. Close examina-
tion of the witness seems to have developed the time of this
discovery to have been 10 or 15 minutes after four. The own-
er of the canoe testified that Lewis was a good boatman;
that the canoe was what he would call medium safe; but

that a person would have to be more careful with it than
with a larger one. These facts, the court held, sufficiently
satisfied the provision in the insurance contract requiring
proof by eyewitnesses. The views expressed on this point
constitute an illuminating example of the practical applica-
tion of the abstract rule or principle which that court else-
where expresses, and which is approved by us in the *Roch*
case, and upon which the appellant largely relies. The opin-
ion proceeds as follows:

"The jury might have found, on the evidence of actual
eyewitnesses, that, shortly before the time when the accident
happened, Lewis and Miss Hurley were upon the river in
what might be called a 'cranky canoe,' liable to overturn at
any moment, unless unusual care was exercised both by
Lewis and his companion; that, within five (perhaps fewer)
minutes of the time when they were last seen alive, the
canoe was overturned, and the bodies were under water.
Here, then, is shown, upon the testimony of eyewitnesses, an
operating cause—namely, the imminent liability of the
capsizing of the boat by reason of its cranky nature, taken in
connection with the fact that it had two occupants, of whom
one was a young woman, not shown to have been experienced
in aiding to keep the canoe in balance. It is not the case
of a boat which is of such size and construction as to be not
liable to be upset by the movements of persons in it, but it
is the case of a cranky canoe, having two persons in it, where
a not unusual movement, even of one of them, may result
in the capsizing of it. An operating cause for disaster is ever
present under such circumstances, and that cause is disclosed
by the testimony of eyewitnesses. Moreover, upon the evi-
dence the jury might have found that the movements of the
canoe and its occupants were shown by eyewitnesses, up to
a time within three or four minutes of the accident; and that
every operating cause of the accident, except the one above
shown to have been present, was fairly excluded by the tes-

timony of these same eyewitnesses. It must be held that, in the case before us, the facts and circumstances of the accident and injury were established by eyewitnesses, within the meaning of the policy."

In other words, if the eyewitnesses testify to personal observation of the "operating cause," it is not required that they shall have seen that cause in actual operation.

If the rule and reasoning here made use of by the Massachusetts court in the *Lewis* case, and adopted and approved by us in the *Roeh* case, are sound, and we think they are, it seems hardly open to question that the judgment for plaintiff in the present case is fairly sustainable. If a "cranky canoe" is an ever-present cause of accident to those riding therein, is it not equally clear that a loaded gun, with very delicate trigger action, in a position where it may be disturbed by a careless or thoughtless movement, is an ever-present operating cause of peril to those who may be employed within its reach? And if the tracing of the movements of the occupants of the canoe may stop anywhere from 5 to 15 minutes short of the final catastrophe, and still the testimony be that of "eyewitnesses, within the meaning of the policy," it will require very considerable ingenuity to find reason for saying, in this case, that the 2 or 3 minutes intervening between Larson's leaving the house, and his hasty reappearance, exclaiming he was hurt, is such a break or hiatus in the history of the case by eyewitnesses as will defeat an action on the policy. To repeat once more the statement of the principle announced in the opinion from which we have quoted so extensively:

"Enough must be testified to by eyewitnesses to show the operating cause of the injury, *or at least to show that, at the time of the injury, there was an operating cause to which the accident may fairly be attributed, and to indicate in a general way the nature of that cause and the manner of its working."*

The record in the case at bar fairly fills the measure of this requirement.

No reversible error is shown, and the judgment of the district court is—*Affirmed*.

PRESTON, C. J., GAYNOR and STEVENS, JJ., concur.