BANKERS' HEALTH & ACCIDENT ASS'N v. WILKES. (No. 1464.)

(Court of Civil Appeals of Texas. Amarillo. Feb. 5, 1919. Rehearing Denied March 5, 1919.)

1. CONTINUANCE ⊜➟26(1)—ABSENCE OF WITNESS—DILIGENCE.

Where circumstances surrounding death of insured on December 19th was investigated 10 days thereafter, suit on policy filed April 24th following, and defendant cited April 30th, court did not err in overruling defendant's application for continuance filed June 3d, because of absence of four witnesses; the witnesses not having been subpœnaed, no effort having been made to take their depositions, and application not stating that due diligence had been used.

2. INSURANCE ⊜➟646(7)—DEATH BY SUICIDE —PRESUMPTION—BURDEN OF PROOF.

Where it is shown that deceased met his death as the result of external and violent means, there arises a presumption against suicide, the force of which is to place upon the insurer the burden of establishing that insured's death was caused by his own hand, or by voluntarily exposing himself to danger.

3. INSURANCE ⊜➟668(12) — ACCIDENT INSURANCE—SUICIDE—QUESTION FOR JURY.

In action on accident policy whether insured's death was due to suicide, held, under the evidence, for the jury.

4. INSURANCE ⊜➟665(5)—ACCIDENTAL DEATH —"EYEWITNESS."

Plaintiff, who was in the room with insured, her husband, when he was shot, and who described minutely circumstances immediately preceding the occurrence, was an "eyewitness," within terms of policy requiring claimant to establish accidental character of injury by testimony of at least one eyewitness.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Eyewitness.]

5. INSURANCE ⊜➟602—ACCIDENT INSURANCE —RECOVERY OF ATTORNEY'S FEES.

Defendant held not a mutual assessment, health, and accident association, organized under Rev. St. 1911, arts. 4794–4808, but an accident insurance company, to which article 4746, providing that failure to pay loss within 30 days shall subject insurer to additional damages and attorney's fees, applies.

6. INSURANCE ⊜➟668(11)—VOLUNTARY EXPOSURE TO DANGER—EVIDENCE.

In action on accident policy, evidence held not to require court to submit issue whether death of insured was caused by his own voluntary exposure to unnecessary danger.

7. INSURANCE ⊜➟466—VOLUNTARY EXPOSURE TO DANGER—PROXIMATE CAUSE.

That insured voluntarily exposed himself to unnecessary danger would not defeat recovery, unless his act in so doing was the proximate cause of the accident.

Appeal from District Court, Garza County; W. R. Spencer, Judge.

Suit by Mrs. Lillie Wilkes against the Bankers' Health & Accident Association. Verdict and judgment for plaintiff, and defendant appeals. Judgment affirmed.

Samuel Schwartz, of Houston, and W. F. Kelly, of Post, for appellant.

Shurtleff & Cummings, of Waco, and Chas. L. Black, of Austin, for appellee.

HALL, J. This suit was filed against appellant upon a policy of insurance issued to the husband of appellee, William A. Wilkes. Appellee prayed for judgment for $5.000, the face of the policy, and for the statutory penalties provided by Rev. St. 1911, art. 4746. The trial was before a jury, resulting in a verdict in favor of appellee for the full amount claimed in the petition.

[1] Under the first assignment appellant says there is error in the court's action in overruling its motion for a continuance. The suit was filed April 24, 1918. Appellant was cited April 30th. The motion was filed on June 3d. The statement of facts shows that appellee's husband died December 19, 1917,

as a result of a gunshot wound which appellee claims was accidental, entitling her to recover under the policy. Appellant's contention is that appellee is not entitled to recover because her husband suicided, or that his death was caused by the voluntary exposure of himself to danger. Immediately after the pistol which killed Wilkes was fired, appellee fled to the home of a neighbor, and it appears from the statement of facts under intense excitement and while frantic with grief made statements to a number of witnesses concerning the occurrence. The application for continuance is filed on account of the absence of four of the witnesses, all females, who heard her make the statements. About 10 days after the death of the husband, on December 19, 1917, a representative of the company went to the town of Post, where appellee resided, and made an investigation of the circumstances surrounding the death, and after the investigation declined to pay appellee anything under the policy. These witnesses were never subpœnaed, nor has any effort ever been made by appellant to take their depositions. It was not shown that Miss White, who it is alleged was sick, was too ill during the entire 30 days to answer interrogatories. Appellant has shown no diligence whatever to procure the testimony of the witnesses, and its application fails to state that it has used due diligence. Not being a statutory application under all the circumstances, it was addressed to the sound discretion of the trial court, who qualified the bill by stating that the testimony, if secured, would be cumulative. We think the court did not err in overruling the application.

[2] Appellant asked the court to direct a verdict in its favor, and the court's refusal is made the basis of the third and several subsequent assignments. It is contended under this assignment that there is nothing in the record to sustain the theory of an accidental shooting, and that the overwhelming weight of the testimony indicates clearly that Wilkes' death was the result of voluntary exposure to danger or suicide. In the first place, where it is shown that the deceased met his death as the result of external and violent means, there arises a presumption against suicide. The force of this presumption is to place upon the appellant the burden of establishing in this case that Wilkes' death was caused by his own hand, or by voluntarily exposing himself to danger. It was shown by the testimony of appellee that she had arranged with her husband to do some Christmas shopping on the afternoon of December 19th, and he told her to ring him up at his place of business after she reached the business district and he would join her there and assist her in her shopping, that she went to town about 6:45 p. m., called him from Dowdy's store to meet her at Warren's Drug Store, and that he came in to the

drug store in a few moments. She left their children at home in charge of two girls who lived in the neighborhood, and who had agreed to care for them during her absence. She says they were shopping for more than an hour; made several purchases in the way of Christmas presents for the children, and it appears that he took an active interest in the matter. She testified:

"As we went home that afternoon William [deceased] and I talked quite a little bit about what we would do Christmas. We were planning to have a little houseparty. We planned what we would do when the girls and boys came and discussed what we would do Christmas Eve night and Christmas Day. William made the remark to me that evening going home that he thought our children were old enough to appreciate Christmas at home. We had been in the habit of going to mother's for Christmas Eve, and had never spent Christmas Eve at home. So we discussed it, and he thought it was best to start Christmas Eve at home, and have Santa Claus at home, and we could go to my mother's the next day for dinner, and I agreed with him, and said that I thought it would be nice for he and I and the babies to be at home together. There was no discussion between he and I other than an agreeable conversation that afternoon. My mother lived here in Post. The little girls were there [home] when we got there. When we got there we had quite a few bundles, and we went in and laid them on the dining room table. * * * William had carried a gun practically ever since I had known him, and it had been his habit and custom the few months preceding his death, while we were using the dining room as our living room, to always put his pistol on the dining room table when he came in the room. That evening when we came in we went into the dining room, and the little girls that we left there were in the dining room. William talked to the little girls, and joked with them, talked with them, and teased them. * * * We had a victrola there in the living room, large double doors between the living room and dining room, and it set right inside, around the door from the dining room. In the room I refer to as the living room, we were not keeping up a stove in there at that time; we were using the dining room for the living room at that time. The victrola was in the room where there was no fire. When William came from the bathroom he went into the dining room, and the little girls were sitting by the fire, and he said something to them, and went and wound the victrola, and turned it on. The little girls left directly after he began playing the victrola. * * * After the girls left of course William was standing in the dining room by the side of the dining room table. I was in the bedroom, fixing the light. I was in the act of taking off my hat, and when I came back through I went to attend to the victrola and William was standing like this on this side of the dining room table, standing there by the table. I don't know what he was doing. I don't think it was an unusual thing for him to do. I didn't notice what he was doing, but while I was there he told me he was going to Judge Dursts, and didn't know how long he would be gone, but would not be gone very

long. Something had previously been said by us about him going to Judge Dursts to get some books. We had been swapping books backward and forwards, and when we were up town Judge Dursts made the remark that he had some good books; he remarked that it seemed like he had been doing all of the borrowing of books; we had not borrowed as many as he, and he said to William to come over and get some books, and we made mention of it going home. When I got there at the victrola, he was still standing by the dining table. When he said something about going to Judge Dursts, and when he said that—I don't recall that I said anything in answer to that—I said, 'All right;' that is what I usually said. I don't know what the next thing was that attracted my attention, but something attracted my attention, and I wondered what it was that did attract my attention. Q. Didn't it sound like a click or something? A. I don't know what it was arrested my attention, but when I turned I just saw the gun flash. I saw just a fire. I never saw the gun at all. I don't remember seeing it in William's hand. I don't remember seeing it in his hand that night, and I know I didn't see it when I turned. All I could see was just a fire. I don't know whether I saw him fall or not. I went to Mrs. Williams the minute I saw the flash."

John R. Williams, who had been associated with the deceased in business, saw him late in the afternoon, and testified:

"He didn't appear to be drinking at all. I didn't think he was drinking at all. He was away from the store about an hour that evening; went up town and stayed awhile, I suppose, about an hour, and came back, but I didn't smell any whisky on his breath, and he didn't act like a man who had had a drink."

Vida Hunter, one of the little girls who kept the children while appellee was shopping, testified:

"I recall the evening when Mr. Wilkes was killed; I had been over to Mrs. Wilkes' home that evening to keep her children. Stella Terrell, another little girl, was there with me. We were there when Mr. Wilkes and his wife returned, and there was nothing unusual in the appearance or conduct of either. Mr. Wilkes came in there and spoke to us, and then he turned around and went back in there and started the victrola. He had something to say to me. He was just as jolly as he ever was, cutting up like he always did. I left soon after he came in. Before I left I didn't see him put a pistol up to his breast and stagger around over the room. I didn't see him with a pistol at all."

The appellee had testified that her husband was drinking on the afternoon in question, and on cross-examination testified:

"I didn't have any trouble with Mr. Wilkes that night; no quarrel with him or anything about his condition, about him being drunk. I didn't upbraid him for it. Our married life had always been happy. I certainly didn't have any trouble with him at any time. I don't mean to say that we never fussed or quarreled. I think it would be an unusual married life for people not to have disagreements. We never had a fuss that we didn't make up. Never had a fuss with him in my life that was not perfectly all right before it was over. That is as far as domestic troubles went with us. He appeared very happy at home. He certainly did love his children; also loved me. I had never asked him for anything I didn't have."

Appellant further insists as evidence tending to prove suicide that the deceased, at the time of his death, was embarrassed financially, and that he had been losing considerable money. Upon this point the evidence shows that he was a bad manager and careless to the extent of being neglectful of his financial interest, but there is nothing to show that this condition worried him. J. P. Crowder testified concerning the pistol which caused the death of Wilkes:

"The pistol that I let Mr. Wilkes have and which was afterwards stolen from me was pretty easy on the trigger. All that you had to do was to touch the trigger and it would go off. It seemed like it was sort of a weak spring. I didn't tell Mr. Wilkes about that when he borrowed the gun. I don't know that I had ever had the gun to go off accidentally. I know it would not hardly stand, etc. * * * It is true that people ordinarily carry these Colt's pistols of that make on an empty, and that is the rule in case it drops or hits anything it would not go off. The hammer of this gun now in this position I guess would be called on half cock. The cylinder will not turn when the hammer is down. It is not necessary to put it in that position in order to turn the cylinder. When a pistol is in perfect working order it cannot be pulled by the trigger from that position there halfcocked. When the pistol is all right, in good working order, that is supposed to be safety. Colt's pistols sometimes get in a position where they can be pulled from a half cock. That pistol looks to be in that condition now where it can be pulled. If this hammer is down on a shell, and if it falls that way, the cartridge can be exploded. It must be made to explode by hitting on something hard like that."

Sheriff Robinson testified with respect to going to the residence after the occurrence as follows:

"I examined the pistol I found there under the edge of the table. There were four loaded shells, one empty shell, and one empty chamber in the gun. It was a six-shooter. There was a loaded shell between the empty one and the empty chamber. Most people who carry guns of that type carry the hammer on an empty chamber to prevent it from exploding if they happen to drop it. If a Colt's of that kind is on an empty chamber, and a person pulls it [the hammer] back to fire it, it will, under those circumstances, fire the cartridge that is next to the empty chamber because the cylinder turns to the right."

The fact that when the pistol was found by the sheriff it had a loaded shell between the empty chamber and the empty shell upon which the hammer rested is urged by appellee as a circumstance to rebut the idea of suicide, and it is insisted that this fact tends to show that he was trying to adjust it or

examining it in some way when if he had intended to kill himself the first shell to the left of the empty chamber would have been exploded. We think the jury were entitled to consider this fact with the others hereinbefore mentioned. Another circumstance which appellant insists shows that Wilkes died by his own hand is that there was found on the muzzle of the pistol burned cloth, and the deceased's flesh was powder burned to some extent where the bullet entered his body. The doctor's testimony shows that the bullet entered between the third and fourth ribs, and was found lodged under the skin about an inch above a direct line through the body. J. R. Williams testified:

"I have set rags on fire from the flash of a pistol at 8 to 12 inches. I don't remember of ever holding a pistol up to within 2 inches of an article and experimenting to see how big a space it will discolor with the powder. I have never tried it at all to see how big a space it would cover; just tried it to set cloth afire because I didn't have any matches. I can build a fire with a pistol. It can be done, and has been done."

Several witnesses testified with reference to the condition of appellee immediately after the occurrence. Mrs. Ben Williams said:

"She was excited. I guess you would call it hysterical. She had hold of me all the time. The condition that I speak of, the hysterical condition, continued when these other ladies and gentlemen came. She continued to be hysterical, and cried out at times that 'I begged and plead with him not to do it.'"

Mrs. Lee Duckworth said:

"As to whether or not she was excited and distressed, will say that she seemed to be perfectly insane; very hysterical."

V. A. Robinson said:

"She was very excited during the time she was making these statements to me that I have mentioned. She fell time after time on the stair steps while she was in that frantic condition."

John R. Williams testified:

"I talked with Mrs. Wilkes that night, and she was talking about William Wilkes' death, of course. I don't believe she undertook to detail to me just the exact circumstances the way it all happened. She was crying and taking on, and telling a good many things, and talking about it, and I don't think she described, as well as I remember now. In the first place, I know she was in no frame of mind to be responsible for a great many things she was saying; she was very much excited. She would start in to tell it and go off in a frenzy, screaming and hollering, and you could not get any satisfaction or sense out of anything she was saying. She did not tell me that she had tried to keep him from doing it; she said she tried to keep him from going to Judge Dursts."

[3] Whatever statements the appellee may have made during the time immediately after the shooting, we think this testimony would require the court to submit the issue of suicide to the jury, and, under such evidence, if the court had directed a verdict for appellant we would have felt it our duty to reverse the judgment.

What is here said disposes of the fourth and fifth assignments.

[4] Under the sixth assignment appellant insists that the court erred in not submitting this special issue to the jury:

"Was there an eyewitness to the death of William Wilkes by whom the accidental character of the shot that caused his death has been established?"

As shown by the testimony hereinbefore quoted, appellee had been shopping with her husband for more than an hour before returning home; that she was in the room with him at the time the pistol was fired; that she had turned and was looking toward him or at him when she heard the report of the pistol and saw the flash. She describes minutely the circumstances immediately preceding the occurrence, stating that he was standing at the table in the dining room where he kept his pistol when he was at home, and we think this is a sufficient compliance with the condition in the policy pleaded by appellant, and which provides:

"If the insured receives bodily injuries, fatal or otherwise, by the discharge of firearms, * * * the claimant shall establish the accidental character of the injury by the testimony of at least one eyewitness to the accident other than the insured himself," etc.

A similar clause in insurance policies has been considered several times, and in the case of Roeh v. Business Men's Protective Association, 164 Iowa, 199, 145 N. W. 479, 51 L. R. A. (N. S.) 221, Ann. Cas. 1915C, 813, has been declared to be valid and binding. Inasmuch as this clause endeavors by contract to fix rules of evidence binding upon courts of justice, and to control judicial proceedings, we are inclined to doubt its validity. Rules of evidence are established by law, and contracts of this character have frequently been declared contrary to public policy and void. Utter v. Travelers' Insurance Co., 65 Mich. 545, 32 N. W. 812, 8 Am. St. Rep. 913; Travelers' Insurance Co. v. Sheppard, 85 Ga. 751, 12 S. E. 18; Reynolds v. Insurance Co., 49 Hun, 605, 59 Hun, 13, 1 N. Y. Supp. 738; Hannon v. Grand Lodge, 99 Kan. 734, 163 Pac. 169, L. R. A. 1917C, 1029; W. O. W. v. Robinson, 187 S. W. 216. It is not, however, necessary for us to determine the validity of this stipulation, since we think, under the few decisions in which this provision has been construed, appellee was an eyewitness within its terms. 14 R. C. L. p. 1265, § 441. The first case, in which such a provision was discussed, is Lewis v. Brotherhood, 194 Mass. 1, 79 N. E. 802, 17 L. R. A. (N. S.) 714. The Supreme Court of Iowa, in Ellis v. Interstate Business Men's

Accident Association (Iowa) 168 N. W. 212, reviewed the authorities to some extent, and quoted from the Roeh Case, supra, in part as follows:

"In the case at bar the event, that is to say, the accidental character of the discharge of firearms resulting in death, must be established by at least one person other than the insured, and 'who was an eyewitness,' does not necessarily mean that the witness should have seen the exact manner of the discharge; but it seems to us that it does comprehend the presence of the witness at or near the scene, and his direct observation of such facts and circumstances connected with the immediate transaction, as of themselves, and without any aid from presumption or inference arising from love of life, or the instincts of self-preservation, indicate that the shooting was accidental."

In the Ellis Case it appears that the deceased, prior to the accident, was working on his automobile. His wife heard him come into the kitchen, and as he entered he called to her: "Come here, Nita; I am hurt." She found him standing in the room dressed in his overalls, and had a monkey-wrench in his hand. She inquired: "How are you hurt?" He replied: "I feel as if something hit me. I was reaching on the shelf for the grease gun when something knocked me over. I think it must have been the .22; I did not know it was there." It appears that the gun was lying on the shelf, covered so he could not see it; that the safety device was operated by slipping it to the side, and it would slip with the slightest touch. He told the doctor that he thought it was an electric shock at first that knocked him down, but when he got up he saw some smoking rags and the end of the rifle sticking out. The effect of the court's holding in the Ellis Case is that his wife, having seen him before his death three minutes after the injury, was an eyewitness, within that clause of the policy. In the opinion the following quotation from Lewis v. Brotherhood, supra, is made with approval:

"An eyewitness is a person who testifies to what he has seen. By the terms of this policy the facts and circumstances of the accident and injury are to be established by those who saw them. Not only are the facts and circumstances of the injury to be established by an eyewitness, but also of the accident, that is, the operating cause of the injury. Enough must be testified to by eyewitnesses to show the operating cause of the injury, or at least to show that at the time of the injury there was an operating cause to which the accident may fairly be attributed, and to indicate in a general way the nature of that cause and the manner of its working."

As shown, the Lewis Case arose from the fact that the insured was drowned while out boating with a young lady. It appears that Lewis and his companion were seen on the river in a canoe. A little later the empty canoe was found floating upon the river, and still later the bodies of Lewis and his companion were recovered. No one saw the canoe capsize, and in fact there was no eyewitness of the immediate facts of the drowning. It further appears from the statement of facts made in the opinion in the Ellis Case that two witnesses who were on the river about five minutes before 4 o'clock in the afternoon met Lewis and the lady going in the opposite direction. One of the witnesses testified that three or four minutes after this meeting and after rounding a point of land which shut the canoe and its occupants from his view he heard a cry or scream, but did not return to see what had happened. Another witness, who said he was on the river about 4 o'clock, discovered the upturned canoe and some articles of clothing floating on the surface of the water. This seems to have been about ten or fifteen minutes after 4 o'clock. Quoting from the opinion, it is said:

"The jury might have found on the evidence of actual eyewitnesses that shortly before the time when the accident happened Lewis and Miss Hurley were upon the river in what might be called a 'cranky' canoe, liable to overturn at any moment, unless unusual care was exercised both by Lewis and his companion; that within five (perhaps fewer) minutes of the time at which they were last seen alive the canoe was overturned and the bodies were under water. Here, then, is shown upon the testimony of eyewitnesses an operating cause, viz. the imminent liability of the capsizing of the boat by reason of its cranky nature, taken in connection with the fact that it had two occupants of whom one was a young woman not shown to have been experienced in aiding to keep the canoe in balance. It is not the case of a boat which is of such size and construction as to be not liable to be upset by the movement of persons in it, but it is a case of a cranky canoe having two persons in it where a not unusual movement, even of one of them, may result in the capsizing of it. An operating cause * * * is ever present under such circumstances, and that cause is disclosed by * * * eyewitnesses. Moreover, upon the evidence the jury might have found that the movements of the canoe and its occupants were shown by eyewitnesses up to a time within three or four minutes of the accident, and that every operating cause of the accident except the one shown to have been present was fairly excluded by the testimony of these same eyewitnesses. It must be held that in the case before us the facts and circumstances of the accident and injury were established by eyewitnesses within the meaning of the policy."

After this quotation from the Lewis Case the court proceeds:

"If a 'cranky canoe' is an ever-present cause of accident to those riding therein, is it not equally clear that a loaded gun with very delicate trigger action, in a position where it may be disturbed by a careless or thoughtless movement, is an ever-present operating cause of peril to those who may be employed within its reach?"

Without quoting further from the authorities, suffice it to say we think under the record the evidence did not raise the issue which appellant requested the court to submit.

[5] Special issue No. 2, submitted to the jury, is:

"What would be a reasonable compensation, as attorney's fees, for representing the plaintiff in this case?"

The submission of this issue is the basis of the seventh, ninth, and eleventh assignments, under which it is contended that because appellant is organized under chapter 5, title 71, of the Revised Civil Statutes of Texas, the penalty provided by article 4746, Rev. St. 1911, does not apply. Appellant alleged that it was a mutual assessment, health and accident association, organized under said chapter and title, but there is no proof in the record of that fact. The only evidence we find which even remotely bears on the issue is the policy itself, which provides for the payment of $1 monthly. This payment is termed both a premium and an assessment. It is stipulated that a failure to pay this monthly premium before the day fixed for payment will result in the assured being in default, and the termination of his membership. As far as we are able to determine from the record, appellant is in that class of accident insurance companies to which article 4746, providing that a failure to pay a loss within 30 days renders it liable to pay the holder of the policy an additional sum of 12 per cent. damages on the amount of the loss, together with attorney's fees, applies. National Life Insurance Co. v. Parsons, 170 S. W. 1038; International Travelers' Association v. Branum, 169 S. W. 389.

[6] Appellant requested the court to submit this special issue to the jury, viz.:

"Was the death of William Wilkes caused or occasioned by his voluntary exposure of himself to an unnecessary danger?"

We think the issue was sufficiently raised by the pleadings, but there is no evidence which required the court to submit it. The testimony relied upon by appellant as tending to sustain this contention is from the appellee and Mrs. Lee Duckworth. Appellee testified:

"A few moments ago, when counsel asked me if there was anything unusual there about William, and I started to say something, and then said I could not be certain, that was something about him staggering, that was when he staggered across a chair, and it seemed to me like I saw the little girl smile and snicker, and it came over me that maybe he was drinking; that was what I hesitated about."

This clearly does not raise the issue, because it does not appear that deceased was in possession of the pistol at that time, or, if so, that it had been taken out of its scabbard. The little girl testified there was nothing unusual occurred, and that Wilkes was jolly and joking them like he always did. Mrs. Lee Duckworth, in reciting the statement made by appellee immediately after the shooting, said:

"She said the children was here, and I didn't want them to see such a tragedy, and I made them leave. I thought at the time that she was referring to her children but I know now her children were asleep at the time; and she and William had just returned from town, and these other children that were there had been watching and minding her children while she was gone; that is what I was told. She didn't tell me what children it was, and I don't know what children it was. I was told it was some other children there watching hers. I heard her say that she begged him not to do it, and she said he had a gun right up this way, just staggering around all over the room, and the children were laughing at him (just had a gun up against his left breast), and said he was staggering around, and that is why she told me about the children that were laughing at him."

We think it is clear from the testimony of the little girl that this occurrence, an account of which appellee gave while in her semicrazed condition, did not transpire, and if we admit that he did place the muzzle of the pistol against his left breast, and stagger around the room for the purpose of amusing the children, this performance had evidently ended before they left the house. The evidence shows that the little girls left immediately after the return of appellee and her husband, and were not present when the shot was fired. The jury would not be authorized to presume that he continued such antics indulged in evidently to amuse the children, if Mrs. Duckworth is to be believed, after the children themselves had left the house.

[7] Even though the evidence required the court to submit the issue, as presented, it was improper. The fact that Wilkes voluntarily exposed himself to unnecessary danger would not defeat appellee's recovery unless his act in so doing was the proximate cause of the accident, and the issue ignores that necessary element. Ætna Life Insurance Co. v. Hicks, 123 Tex. Civ. App. 74, 56 S. W. 87, 90; 1 C. J. 450, § 122; Fuller on Accident Insurance, pp. 241, 242. Any evidence other than that quoted, which tended to show the voluntary exposure by deceased to a known danger, is evidence bearing more directly upon the theory of suicide, and since the jury has found against that contention, the inquiry in that direction is foreclosed.

We think the judgment is the only one which could be properly entered under the pleadings and evidence, and it is affirmed.