## VILLEMARETTE v. SOVEREIGN CAMP, W. O. W.
### No. 5657.

Court of Appeal of Louisiana. Second Circuit.

Jan. 3, 1938.

Couvillon & Couvillon, of Marksville, for appellant.

Lester L. Bordelon, of Marksville, for appellee.

HAMITER, Judge.

An insurance benefit certificate was issued by the defendant fraternal organization under date of October 22, 1928, the insured thereunder being Murphy Villemarette, while the beneficiary was Anezia T. Villemarette. On July 18, 1929, there was a change in beneficiary, and Mrs. Martha Villemarette, the insured's wife and the plaintiff in this suit, was designated as such.

The regular death benefit under the certificate was $1,000. However, the double indemnity provision, contained therein, was to the effect that $2,000 would be paid to the named beneficiary in the event the death of insured resulted from an accident as defined in paragraph 1 of the certificate. This paragraph reads: "The double benefit for accidental death provided herein is payable only in lieu of all other benefits, upon approval by the association of proof of death that the death of the member occurred before attaining age sixty in consequence of personal, external, bodily injuries, producing total disability from the date of the accident, the death of the member, exclusive of all other causes, being caused solely and directly by external, violent and accidental means and within ninety days of the date of the accident, and not resulting, wholly or in part, directly or indirectly, from disease or bodily infirmity."

The insured died on the 23d day of June, 1936, by reason of the accidental discharge on that day of a 22-caliber rifle. When defendant refused to pay to the beneficiary both the ordinary death and the double indemnity benefits, she instituted this suit. In her petition she claims the regular benefit and an additional $1,000 as double indemnity for the accidental death.

Defendant, in its answer, admits owing plaintiff the regular death benefit, but denies liability under the double indemnity claim. With reference to this denial, it urges as its sole defense that there was no eyewitness to the alleged accidental shooting which caused the death of the assured, as provided for and required in the insurance agreement. The defense of suicide is not made and it is not disputed that the shooting was accidental. The provision relied on is found in paragraph 10 of section 57 of the constitution, laws, and by-laws of defendant, which is declared to be a part of the contract, and reads as follows: "The association shall not be liable for the payment of double indemnity under any beneficiary certificate providing for double indemnity in case of the death of the member by accident, where it is claimed that death resulted from accidental drowning, cutting, poisoning, hanging, inhalation of gas, discharge of firearms or shooting, unless the fact that such drowning, cutting, poisoning, hanging, inhalation of gas, discharge of firearms or shooting was accidental shall be established by the testimony of at least one person other than the member, who was an eyewitness to such drowning, cutting, poisoning, hanging, inhalation of gas, discharge of firearms or shooting."

A trial of the merits of the case resulted in a judgment in plaintiff's favor and against the defendant "in the full sum of $2000.00, $1000.00 of which represents the face value of the policy of Murphy Villemarette, deceased, and an additional $1000.00 representing the double indemnity as a result of the death of the said Murphy Villemarette from violent and accidental means, together with five per cent per annum interest from judicial demand until paid and for all costs of this suit." Defendant appealed from this judgment.

Assuming, arguendo, and for that purpose only, that the above-quoted provision of defendant's constitution, laws, and by-laws is valid, legal, and effective, and binding on plaintiff, we are called on to determine in the instant case the one question of whether or not there was an eyewitness to the discharge of the firearm that caused insured's death, within the meaning of said provision, whose testimony could establish that the shooting was accidental.

Our appreciation of the pertinent facts of the case, as disclosed by the record, is as follows: Plaintiff and the insured had been married since June 11, 1929. At the time of the latter's death, and for about four years prior thereto, they lived in a building, which was a combination filling station and dwelling house, situated at the intersection of the Bunkie-Marksville and

Hessmer-Mansura highways in Avoyelles parish, La. The filling station occupied the front portion of the building. Adjoining it on the rear was a room used as a repair shop, and behind and next to that room were the kitchen and bedroom. Doors opened from the kitchen into the back yard, the repair room, and the bedroom, and there was also a door opening from the repair room into the filling station.

On the morning of June 23, 1936, the day of the accident in question, insured and his wife attended the wedding of the latter's brother which was held in Moreauville, La. After the ceremony was performed, they participated in certain wedding festivities, which included a breakfast. At approximately 9:30 of that morning, they left Moreauville and returned to their home. Shortly after their arrival the insured changed from his good clothes to those usually worn by him while working. His wife also made a change of clothing, and then proceeded to open some doors and windows of the building. When she opened the kitchen door her ducks were on the steps. She obtained some corn and fed them, and upon her return to the room her husband said, "suppose we have duck for dinner." She told him that it was late, but nevertheless he took his 22-caliber rifle, opened the screen door leading to the back yard, and shot at a duck. This shot was not effective. He then came into the kitchen, extracted the shell from the rifle and inserted another. The new shell became clogged and he tapped the rifle and said, "the bullet is clogged." The wife told him that it was late, and suggested that he get ready to repair the car that he had for Mr. Adonis Ducote and that in the meantime she would proceed to open up the station.

As she left the kitchen, she noticed that her husband was tapping the rifle on the floor. She went into the repair room, opened the door leading from that room into the station, and stepped into or through the passageway. At this time, while she was six or seven yards from the kitchen with her back toward it, she heard the discharge of the rifle. Immediately, upon hearing this, she turned and faced the kitchen.

A conflict is presented by the testimony in the record with reference to whether or not the wife could see her husband when she turned after hearing the explosion of the cartridge. It is our belief that she could, just as she so testified. The door

between the kitchen and repair room and that between the filling station and repair room were open. The wife was standing in or just in front of the filling station doorway at the time, while the husband fell with his head in the kitchen doorway. The trial judge's finding on this question of fact, as revealed by his well-prepared, written opinion, is in accord with our conclusion. He said: "The court visited the place in company of the attorneys representing both sides, together with the plaintiff and a deputy sheriff, and it is satisfied that from the position she occupied at the time the shot was fired she could plainly see him from where he stood, to-wit: practically in the door of the kitchen, and she was standing at the front door of the service department blocking the door just as she had opened it. In other words, there was absolutely nothing to obstruct her view of the position he occupied at the time the fatal shot was fired."

On reaching the insured after the shooting, the wife inquired, "how did this happen?" After several moments had elapsed, he said: "I'm shot, Gippy." She then called for assistance.

All of the facts which we have herein found, and have recited above, were testified to by plaintiff during the trial of the case.

Interpretations have been placed on insurance clauses similar to the one involved herein by many of the appellate courts of the United States, as is to be seen from the annotations in 62 A.L.R. p. 42, and from 14 R.C.L. § 441, and supplements. A case cited among those authorities is from the Court of Appeal, First Circuit of this state, entitled Wild v. Sovereign Camp, W. O. W., and the opinion therein, written by Judge Le Blanc, is reported in 149 So. 906, 908. That case presented a question of whether or not one Breaux was an eyewitness to the shooting of the insured. The court's answer was in the affirmative, and this was based on the following facts: "He was immediately at the scene of the accident at the very moment that it happened. He had been talking to the deceased and had seen him handling and cleaning the rifle just at the time. He turned around to attend to some of his duties and heard the discharge of the rifle. He then turned around again and saw the deceased lying on the floor, about ten feet from him, shot in the temple with a .22 caliber ball."

The opinion in the Wild Case, supra, quoted approvingly from 5 R.C.L., Permanent Supplement, p. 3799, § 441, as follows: "The provision as to proof by an eye-witness does not require that the witness must have seen the actual discharge of the firearm. It comprehends the presence of the witness at or near the scene, and his direct observation of such facts and circumstances connected with the immediate transaction, as of themselves, and without any aid from the presumption or inference arising from love of life or the instincts of self-preservation, indicate that the killing was accidental."

In the case of Lewis v. Brotherhood Accident Company, 194 Mass. 1, 79 N.E. 802, 805, 17 L.R.A., N.S., 714, it was said that: "Enough must be testified to by eyewitnesses to show the operating cause of the injury, or at least to show that at the time of the injury there was an operating cause to which the accident may fairly be attributed, and to indicate in a general way the nature of that cause and the manner of its working."

Illustrations, with reference to the doctrine just announced, were given as follows: "Suppose a person standing upon the shore sees not far out a boat sailing peacefully along in a mild breeze, with a competent and careful man at the helm. The boat is so large and steady that it is not likely to be capsized by any movement the man would make, nor by the wind as then blowing. In no sense can the boat be said to be in then present peril from any cause. Suppose the observer leaves the shore and returns in an hour, and then sees the upturned boat near where he first saw it. During his absence an accident has happened resulting in the upsetting of the boat. Can it be said that he has seen the circumstances of the accident within any fair interpretation of the language? He has seen no cause in operation to which the accident may be fairly attributed. But suppose that when he first sees the boat, or while he is looking at it, a squall suddenly looms up in the distance and rapidly approaches the boat. He sees it strike the boat, putting her in evident peril. Wanting to get a better look he runs to a house for a spy glass, is gone only a few minutes, and when he returns sees only a capsized boat. Such a man is an eyewitness of the accident, although he did not actually see the boat capsize. He saw the boat in peril from a then impending cause. He saw the

cause at work and he saw what was the natural effect of such a cause. That is far enough; and in such a case the cause of the accident must be held to have been established by an eyewitness within the meaning of the policy."

The views expressed in the afore-cited cases are in accord with ours. For one to be an eyewitness to a shooting, within the meaning of the above-quoted policy provision, it is not necessary that he see the pull of the gun's trigger, the flash of the discharge, and the course of the bullet on its mission of devastation. It is sufficient that he witness facts, circumstances, and happenings immediately preceding and leading to the discharge of the firearm, from which the conclusion may reasonably and fairly be drawn that they caused the accident.

Let us suppose that two railroad locomotives approached each other on a single track at a fast rate of speed and collided. A man watched the travel and approach of both until a moment before the impact, and then heard the noise resulting from their running together. He did not see the occurrence of the actual collision because of a large building which intervened between him and the point of contact and served to obstruct his view. The engineer of one of the locomotives was killed. Although the collision itself was not observable to the witness, he saw an operating cause and circumstances to which the accident and resultant death could fairly be attributed. In so far as a policy provision similar to the one here involved is concerned, in our opinion, that person could be considered an eyewitness to the accident and death.

Considering the facts in the instant case in the light of the above-discussed jurisprudence and illustrations, we hold that plaintiff was an eyewitness to the accidental shooting of the insured, within the meaning and intendment of the insurance provision in question, and that recovery should be hers with reference to double indemnity benefits under the certificate. Although she did not witness the final happening in the chain of events that constituted the operating cause of the accident, she saw and testified to circumstances and facts from which it can reasonably be concluded that the accident happened.

We see no error in the judgment of the trial court, and it is affirmed, with costs.