## WIGGINTON v. ORDER OF UNITED COMMERCIAL TRAVELERS OF AMERICA.

### No. 7785.

Circuit Court of Appeals, Seventh Circuit,
Feb. 9, 1942.

Rehearing Denied April 13, 1942.

E. W. Dillon, of Columbus, Ohio, and Chas. M. LaFollette, Herman L. McCray, and F. Bayard Culley, Jr., all of Evansville, Ind., for appellant.

Richard Waller, Richard R. McGinnis, and D. Bailey Merrill, all of Evansville, Ind., for appellee.

Before MAJOR and MINTON, Circuit Judges, and LINDLEY, District Judge.

MINTON, Circuit Judge.

Charles S. Wigginton died November 4, 1939 in his office in Evansville, Indiana, as the result of a gunshot wound. At the time of his death he was a Class A member in good standing of the Order of United Commercial Travelers of America, the appellant herein. The appellant is a fraternal benefit society incorporated

and existing under the laws of Ohio and authorized to do business in Indiana. It had issued on January 2, 1914 to the deceased, Wigginton, an insurance certificate which contained the following provision:

"This Certificate, the Constitution, By-laws and Articles of Incorporation of said Order, together with the application for insurance signed by said Insured Member, shall constitute the contract between said Order and said Insured Member and shall govern the payment of benefits, and any changes, additions or amendments to said Constitution, By-laws, or Articles of Incorporation, hereafter duly made, shall bind said Order and said Insured Member and his beneficiary or beneficiaries, and shall govern and control the contract in all respects."

The benefit certificate when issued to the deceased contained this provision from the association's constitution:

"Class A. Insured Members shall be indemnified, in accordance with the terms hereinafter set out in this Article, against the results of bodily injury hereinafter mentioned effected through external, violent and accidental means, herein termed the accident, which shall be occasioned by the said accident alone and independent of all other causes.

"Item (11) For death........ $6,300.00

"Five Thousand ($5,000.00) Dollars of which shall be paid within ninety (90) days from the receipt by the Supreme Executive Committee of satisfactory final proofs of death and Thirteen Hundred ($1300.00) Dollars in weekly installments of Twenty-five ($25.00) Dollars each, beginning within ninety (90) days from the receipt of such final proofs."

At the annual meeting of the Supreme Council of the appellant held in 1931 the following change was made in the constitution of the appellant:

"Nor shall the Order be liable for any death benefit when the member dies as the result of injuries sustained as a result of a gunshot wound or the alleged accidental discharge of firearms where there is no eyewitness except the member himself, in an amount greater than Five Hundred Dollars ($500.00)."

Thus it will be seen by the amendment of the constitution the appellant has purported to change the contract with the deceased as to appellant's liability there-

under if death was caused by a gunshot wound.

The appellee was the wife of deceased and the beneficiary in the certificate. She brought suit in the Superior Court of Vanderburgh County, Indiana, to recover. The appellant, the defendant below, removed the case to the United States District Court for the Southern District of Indiana on the grounds of diversity of citizenship. The appellee recovered a judgment and this appeal followed.

We are presented with a question on the evidence as to whether there was an eyewitness, within the meaning of the constitution as amended, and a question as to the validity of the change in the constitution of 1931 as applied to the certificate issued to the deceased, Wigginton.

We lay to one side the question of the validity of the amendment to the constitution and proceed to a determination of whether under the undisputed facts in this case there was an eyewitness within the meaning of the amendment.

Since the facts are not in dispute, we are free to consider them and to reach our own conclusion, untrammeled by the District Court's findings and conclusions of law. Especially is this rule applicable in the case at bar, where all the facts are stipulated. United States v. Anderson Company, 7 Cir., 119 F.2d 343, 346; United States v. E. J. Biggs Construction Co., 7 Cir., 116 F.2d 768, 770.

On November 4, 1939, the deceased was in his office on the ninth floor of an office building in Evansville, Indiana. About 12:15 p. m. he took his shotgun and placed it on his desk in his office for the purpose of cleaning it. At the same time he also placed upon his desk a can of oil, a cleaning rag, the cleaning rod and his pocket knife, and actually started to clean his gun. These facts were observed by his secretary, Mrs. McGowan, as she left the office about 12:15. At the time she left, deceased was actually engaged in cleaning the gun.

Reese Young shortly before noon had called the deceased and made a business appointment with him in his office for about 1:30 p. m.

After Mrs. McGowan had left the office, the deceased left his office at about 12:45 p. m., went down to the ground floor on the elevator and returned shortly thereafter by the same means to the ninth floor of the

office building. On this occasion he had an ordinary conversation with the elevator operator.

Between 1:15 and 1:30 p. m. Mr. Young stepped from the elevator on the ninth floor of the building and had taken about three steps when he heard a sound resembling a gunshot. At this time he was in a position where he could see the length of the hallway and the door of the deceased's office but he could not see in the office. He saw no one in the hallway. The door to the deceased's office was open into the hallway along which Young was walking. Young proceeded along the hallway to the office of the deceased and entered through the open door within about twelve seconds from the time he heard the gunshot. There he saw the body of the deceased lying on the floor of the office, and saw the shotgun and the cleaning articles lying on the desk, with the barrel of the shotgun pointing towards the chair of the deceased behind his desk. He did not see anyone else in the room at that time. There is no evidence that deceased's actions or conduct indicated anything out of the ordinary, or that he might be contemplating suicide.

In a few moments several other people came into the room. A doctor was summoned immediately and it was found Wigginton had died from a gunshot wound to his left chest and heart and that death was practically instantaneous. One of the barrels of the shotgun which was lying on the desk had been discharged.

■ Was there an eyewitness within the meaning of this amendment to the constitution which was a part of the insurance certificate? The courts of Indiana have never passed upon a case of this kind. If we knew what the law of Indiana was on the question, we would be bound to follow it. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487. Since we have no guide from the courts of Indiana as to what the law of Indiana is, we are bound to declare the law of this case. We shall therefore turn to a consideration of the decisions of courts of other states in our efforts to determine the law of this case.

■ The leading case on this subject is Lewis v. Brotherhood Accident Company, 194 Mass. 1, 79 N.E. 802, 804, 17 L.R.A., N.S., 714. In this case the insurer had a limited liability under its certificate if death occurred by drowning "when the facts and circumstances of the accident and injury are not established by the testimony of an actual eyewitness." We quote at length from this opinion as it is the leading case from which all others stem:

"What does the clause mean? An eyewitness is a person who testifies to what he has seen. By the terms of this policy the facts and circumstances of the accident and injury are to be established by those who saw them. Not only the fact [and circumstances] of the injury is to be established by an eyewitness, but also the facts and circumstances of the accident, that is, the operating cause of the injury. Enough must be testified to by eyewitnesses to show the operating cause of the injury, or at least to show that at the time of the injury there was an operating cause to which the accident may fairly be attributed, and to indicate in a general way the nature of that cause and the manner of its working. To illustrate. Suppose a person standing upon the shore sees not far out a boat sailing peacefully along in a mild breeze, with a competent and careful man at the helm. The boat is so large and steady that it is not likely to be capsized by any movement the man would make, nor by the wind as then blowing. In no sense can the boat be said to be in then present peril from any cause. Suppose the observer leaves the shore and returns in an hour, and then sees the upturned boat near where he first saw it. During his absence an accident has happened resulting in the upsetting of the boat. Can it be said that he has seen the circumstances of the accident within any fair interpretation of the language? He has seen no cause in operation to which the accident may be fairly attributed. But suppose that when he first sees the boat, or while he is looking at it, a squall suddenly looms up in the distance and rapidly approaches the boat. He sees it strike the boat, putting her in evident peril. Wanting to get a better look he runs to a house for a spy glass, is gone only a few minutes, and when he returns sees only a capsized boat. Such a man is an eyewitness of the accident, although he did not actually see the boat capsize. He saw the boat in peril from a then impending cause. He saw the cause at work and he saw what was the natural effect of such a cause. That is far enough; and in such a case the cause of the accident must be held to have been established by an eyewitness within the meaning of the policy.

"In the light of this interpretation of the clause we proceed to examine the evidence in this case to see to what extent the facts and circumstances of the accident and the injury are shown. One Black testified that about five minutes before 4 o'clock in the afternoon of June 25, 1902, he, being out on the river in a skiff with one Reissman, saw Lewis in a red canoe with a lady, going 'in the opposite direction from the way the witness was going. Lewis was paddling the canoe sitting in the stern, and Miss Hurley was sitting in the center of the canoe on the bottom, leaning back against the cushions. The pair were talking, and Lewis smiled and bowed to witness.' The witness had known Lewis very well for two years. 'Lewis looked bright and happy; * * * the pair were chatting together; * * * Miss Hurley appeared the same as any young woman on the river; and * * * Lewis was a good hand on the river.' He 'had his coat and vest off.' Reissman, who was with Black, testified substantially to the same facts. He further said that about three or four minutes after they had passed the couple, and after a point of land had shut the canoe out of sight, he heard a scream, but could not swear whether it was the scream of a man or a woman; that it did not seem to him at the time to be a cry of agony; that it seemed like a cry of despair, but that he did not go back, and never thought any more of it until the next day, when he heard of the accident. So far as appears this was the last time either Lewis or Miss Hurley was seen alive.

"One Chellman testified that he was out on the river that afternoon, but did not know Lewis; that shortly before 4 o'clock the witness and a man named Esselen 'were coming up the river and found the overturned canoe; that they were paddling and had been picking pond lilies; that as they came around the bend he discovered the cushions and the lady's coat, gentleman's coat and lady's hat, and a red canoe, bottom up; that the carpet was with the canoe with one end thrown over the bottom, and after paddling around they found a gentleman's vest five feet under water; that he fished it out; that it was not on the bottom; that he looked at the watch and that it was stopped at 4 o'clock; that the vest was soaked through, but that the other things had not sunk below the surface; that these things were found not later than quarter past 4; that they picked up the things,' and towed the boat to the Hiatt boathouse. On cross-examination, he appeared a little uncertain as to the precise time, but placed the time as near 4 o'clock. He also said that the canoe was about 20 feet from the shore. He was corroborated by Esselen, who fixed the time of picking up the things as 'within 10 or 15 minutes past 4.'

"The next day the bodies of Lewis and Miss Hurley were taken from the river near the place of the accident, and there was no question about identification. There were no external marks upon the body of Lewis, and the medical examiner testified that death was caused by drowning, and that in his opinion it was a case of accidental drowning. Hiatt, the owner of the canoe, testified that Lewis hired the canoe about 2 o'clock; that he 'seemed natural'; and that 'he was a very good boatman and had been coming constantly to his boathouse for two seasons.' As to the canoe, he testified that it was a '16-foot canoe of 34 or 35 inch beam, made of cedar with a canvas skin painted red'; that it 'was what he should call a medium safe canoe, that a person would have to be more careful with it than with a larger one.' On cross-examination he testified that there 'was no reason for his (Lewis') upsetting in a medium safe canoe; * * * that he was a perfectly competent man and had a perfectly safe canoe.'

"It is unnecessary to recite the evidence further in detail. The jury might have found on the evidence of actual eyewitnesses that shortly before the time when the accident happened, Lewis and Miss Hurley were upon the river in what might be called a 'cranky' canoe, liable to overturn at any moment unless unusual care was exercised both by Lewis and his companion; that within five (perhaps fewer) minutes of the time at which they were last seen alive the canoe was overturned and the bodies were under water. Here then is shown upon the testimony of eyewitnesses an operating cause,—namely, the imminent liability of the capsizing of the canoe by reason of its unusually cranky nature, taken in connection with the fact that it had two occupants of whom one was a young woman not shown to have been experienced in aiding to keep the canoe in balance. It is not the case of a boat which is of such size and construction as to be not liable to be upset by the movements of persons in it, but it is the case of a cranky canoe having two per-

sons in it where a not unusual movement, even of one of them, may result in the capsizing of it. An operating cause for disaster is ever present under such circumstances, and that cause is disclosed by the testimony of eyewitnesses. Moreover, upon the evidence the jury might have found that the movements of the canoe and its occupants were shown by eyewitnesses up to a time within three or four minutes of the accident, and that every operating cause of the accident except the one above shown to have been present was fairly excluded by the testimony of these same eyewitnesses. It must be held that in the case before us the facts and circumstances of the accident and injury were established by eyewitnesses within the meaning of the policy. We see no substantial error in the manner in which the trial judge dealt with this branch of the case."

In the case of Pride v. Interstate Business Men's Acc. Ass'n, 207 Iowa 167, 216 N.W. 62, 63, 62 A.L.R. 31, the case of Lewis v. Brotherhood Acc. Co., supra, was followed. In the Pride case, the policy provided limited liability "unless the claimant shall establish the accidental cause of the discharge by the testimony of a person other than the insured or the claimant, who saw the cause in operation at the time of the discharge." In that case the insured was seen to leave his house about one or one-thirty a. m., dressed in his night clothes and armed with a rifle and to go out in his yard, apparently in search of something or someone. Two young men observed him about forty feet away, and they saw him stoop over, apparently looking under the porch, and then looking behind a tree. While the insured was engaged in this kind of activity, the witnesses heard the crack of a rifle. The insured continued in apparent search but finally sank to the ground. He was immediately carried into the house and it was discovered that he had a gunshot wound from the rifle he was carrying, from which wound he died a week later. The witnesses testified they saw him only dimly in the dark and they did not know at the time who he was. They did not see the gun or any powder flash. There was evidence introduced to show that several nights before, the insured, armed with his gun, had been out in the yard looking for prowlers.

In holding this evidence sufficient to satisfy the requirements of the policy, the court said:

"But the policy purports to open the door to proof by disinterested persons whereby recovery may be had for the maximum amount named. We think, therefore, that it should receive an interpretation consistent with its apparent spirit and intent. This is that in the given event there must be some person who by reason of his presence can testify to his personal knowledge of the circumstances attending the event. If from the testimony of such witness, and from the inferences which can fairly be drawn from the circumstances testified to by him, a jury can fairly say that the discharge of the firearms was accidental, then the requirement of the policy is complied with at this point. Nor is the exercise by the witness of other senses than that of sight to be disregarded."

In the case of Ellis v. Interstate Business Men's Accident Ass'n., 183 Iowa 1279, 168 N.W. 212, 213, L.R.A.1918F, 414, the insurer was not liable under the policy for death by the discharge of firearms unless the parties "shall establish the accidental character of such discharge by the testimony of at least one person, other than the member, who was an eyewitness of the event."

The facts in this case show that the insured went to the garage to work on his car. A few minutes later he ran into the kitchen, stating he had been injured, and the facts revealed he had a gunshot wound. The evidence further showed that out in the garage upon a shelf was a "22" rifle easy on the trigger, and when the insured reached upon the shelf to get a tool, he was suddenly hit by something; he ran to the house where it was discovered he was shot, and the gun was found on the shelf with evidence in and about it which showed that it had been fired recently. The court held under these facts provisions of the policy were satisfied, and after having quoted extensively from Lewis v. Brotherhood Acc. Co., supra, the court said:

"In other words, if the eyewitnesses testify to personal observations of the 'operating cause,' it is not required that they shall have seen that cause in actual operation.

"If the rule and reasoning here made use of by the Massachusetts court in the Lewis case and adopted and approved by us in the Roeh case [Roeh v. Business Men's Protective Ass'n, 164 Iowa 199, 145 N.W. 479, 51 L.R.A.,N.S., 221, Ann.Cas.

1915C, 813], are sound—and we think they are—it seems hardly open to question that the judgment for plaintiff in the present case is fairly sustainable. If a 'cranky canoe' is an ever-present cause of accident to those riding therein, is it not equally clear that a loaded gun with very delicate trigger action, in a position where it may be disturbed by a careless or thoughtless movement, is an ever-present operating cause of peril to those who may be employed within its reach? And if the tracing of the movements of the occupants of the canoe may stop anywhere from 5 to 15 minutes short of the final catastrophe, and still the testimony be that of 'eyewitnesses within the meaning of the policy,' it will require very considerable ingenuity to find reason for saying in this case that the 2 or 3 minutes intervening between Larson's leaving the house and his hasty reappearance, exclaiming he was hurt, is such a break or hiatus in the history of the case by eyewitnesses as will defeat an action on the policy. To repeat once more the statement of the principle announced in the opinion from which we have quoted so extensively: 'Enough must be testified to by eyewitnesses to show the operating cause of the injury, *or at least to show that at the time of the injury there was an operating cause to which the accident may fairly be attributed, and to indicate in a general way the nature of that cause and the manner of its working.*' "

In Order of U. C. T. of America v. Knorr, 10 Cir., 112 F.2d 679, 681, the court had under consideration the exact provision involved in the case at bar. The facts were as follows:

Knorr, the insured, started hunting. He had his shotgun with him and was riding in his automobile on a public highway, and one Drury was following Knorr's car on the highway at a short distance, but not paying any attention to Knorr. Drury had the windows closed on his car and was playing the radio. When Drury's car was within a hundred yards of Knorr's car, he observed Knorr's car to stop. The door opened and Knorr fell out on the ground. Drury had not heard the shot fired and his first observation that anything was wrong was when Knorr fell out on the highway. Knorr had been shot through the body just above the heart, and the shotgun was lying on the floor in the car. A box of shells was on the seat; some shells were lying on the seat, and some empty shells were on the floor. There was no evidence that any of the shot struck the car.

The lower court gave the following instructions, which the Circuit Court of Appeals held correctly stated the law:

"'You are instructed that the constitution of the defendant provides that it shall not be liable in excess of $500.00 for the death of a member by gunshot wound or the accidental discharge of firearms where there was no eye witness except the member himself. Now, this provision should be given a liberal interpretation. To comply with this clause, there need not be proof that the human eye of another person actually saw the shot fired or as has been expressed, that the human eye is not required to follow the bullet in its course, or that the pulling of the trigger or the action of the trigger need not have been observed. It is sufficient if the jury conclude from all of the facts and circumstances that the accident did not occur when the party was alone, or in complete solitude, as is the case with a person who takes his own life. It is sufficient if the jury conclude from all the facts and circumstances that the accident did not occur in the solitude sought by suicides, but that it did occur as is often the case in accidents when a third person was in a position to observe the general circumstances surrounding the untoward event.' "

These cases illustrate the rule which we think is applicable to the facts in the case at bar, and, in our opinion, warrant a holding in this case that the provision of the eyewitness amendment to the constitution was satisfied. Other cases supporting this doctrine are: Villemarette v. Sovereign Camp, W. O. W., La.App., 178 So. 648; Bankers' Health & Accident Ass'n v. Wilkes, Tex.Civ.App., 209 S.W. 230.

Appellant has cited cases which it contends support a contrary view. We do not find it necessary to review these cases. Each seems to us to be distinguishable on the facts from the cases heretofore cited and relied upon. In none of these cases, in which the court had held the eyewitness provision had not been met, did the evidence disclose that the operating cause was observed by an eyewitness previous to or at the time of the accident.

From these cases we learn why the benefit societies like the appellant have inserted such provisions in their consti-

tutions. It was to avoid the presumption indulged in by the courts and supposed to arise from the natural love of life and the instincts of self-preservation, used by the courts to meet the defense of suicide, and to require the event to be taken from the solitude sought by suicides. Order of United Commercial Travelers of America v. Knorr, 10 Cir., 112 F.2d 679; Wild v. Sovereign Camp, W. O. W., La.App., 149 So. 906.

The appellant agrees and the cases all hold that the eyewitness is not confined to one who saw the whole of the circumstances that throw light upon the event, and that it is not necessary that the actual discharge of the gun be seen by an eyewitness.

■■■■ A witness is one who testifies to what he has seen, heard or otherwise observed. The requirements necessary to establish satisfaction of the eyewitness provision are stated in 5 R.C.L. Permanent Supplement, p. 3799, as follows:

"The provision as to proof by an eyewitness does not require that the witness must have seen the actual discharge of the firearm. It comprehends the presence of the witness at or near the scene, and his direct observation of such facts and circumstances connected with the immediate transaction, as of themselves, and without any aid from the presumption or inference arising from love of life or the instincts of self-preservation, indicate that the killing was accidental."

In the Lewis case the rule is stated thus:

"Enough must be testified to by eyewitnesses to show the operating cause of the injury, or at least to show that at the time of the injury there was an operating cause to which the accident may fairly be attributed, and to indicate in a general way the nature of that cause and the manner of its working."

What was the operating cause in the case at bar? In the Lewis case it was the tricky canoe being paddled in the river. In the case at bar, it was a loaded shotgun in the process of being cleaned. In the instant case, it is the situation in which there is the ever-present danger of a gunshot wound. This situation was observed by Mrs. McGowan as she left the office an hour before the discharge of the gun. We attach no significance to the fact that an hour or more of time elapsed between the time Mrs. McGowan saw the deceased in the act of cleaning the gun and his injury, and the fact that during this space of time the deceased had left his office for several minutes, as the deceased was found in the same situation with relation to the operating cause as Mrs. McGowan observed him to be in when she left the office.

Just as the witnesses to the operating cause in the Lewis case of the cranky canoe being paddled in the river had passed from the scene before the drowning, so here Mrs. McGowan had observed the operating cause and had passed from the scene. We have found no authority in which the lapse of time between the time the operating cause was observed and the happening of the event causing death was held to be material. Within a few seconds after the sound of the gun was heard, Mr. Young entered the deceased's office through a door standing wide open and leading into the hallway of the office building, and found Wigginton dying of a gunshot wound—just as in the Lewis case in a few minutes after a scream was heard, the canoe was found upset, floating in the stream, with the occupants' clothes floating in the water. The situation surrounding Wigginton, as testified to by Mrs. McGowan, when found by Young was changed only by the fact that the danger which lurks in a loaded shotgun being cleaned had been demonstrated. The demonstration had taken place under such circumstances seen by eyewitnesses "as of themselves, and without any aid from the presumption or inference arising from love of life or the instincts of self-preservation" to warrant the conclusion that the death was accidental and that it did not occur in that solitude sought by suicides.

We therefore agree with the District Court that on the undisputed evidence in this case there was an eyewitness within the meaning of the amendment.

■■■■ Furthermore, we think the provision of the constitution of the appellant order under consideration in this case is ambiguous. It provides that there must be an eyewitness. Witness to what? The dying or the shooting? Surely, it cannot be said that this provision is clear as to which one is meant. We are unable to determine from a reading of the provision which one is meant. Contracts of insurance are construed most strongly against the insurance company, and so as to give protection to the insured if this can rea-

sonably be done. Masonic Acc. Ins. Co. v. Jackson, 200 Ind. 472, 164 N.E. 628, 61 A.L.R. 840.

▪ In the case at bar, there was an eyewitness to the death of the insured. Mr. Young was upon the scene within twelve seconds. It is a fair inference, which we are authorized in this case to draw, that Young saw Wigginton dying. It is reasonable to construe the policy, which is ambiguous, so as to mean that there shall be an eyewitness to the "dying." We so construe it. Young was the eyewitness to the dying. Therefore, the requirements of the policy were met.

The case is affirmed.