**SHULTZ et al. v. MANUFACTURERS & TRADERS TRUST CO. et al.**

**No. 241.**

Circuit Court of Appeals, Second Circuit.

June 17, 1942.

890

See, also, 32 F.Supp. 120.

Martin Conboy, of New York City (Jules C. Randal and David C. Adams, both of Buffalo, N. Y., and David Asch, of New York City, on the brief), for plaintiffs.

Harold R. Medina, of New York City (Babcock, Hollister, Newbury & Russ, Louis L. Babcock, and Noel S. Symons, all of Buffalo, N. Y., and William Gilbert, of New York City, on the brief), for defendant Manufacturers & Traders Trust Co.

Joseph H. Morey, of Buffalo, N. Y. (Rann, Brown, Sturtevant & Kelly, of Buffalo, N. Y., on the brief), for defendants George H. Chisholm and Harry L. Chisholm.

Mason O. Damon, of Buffalo, N. Y. (Dudley, Stowe & Sawyer and Roy P. Ohlin, all of Buffalo, N. Y., on the brief), for defendant Sawyer.

Francis S. Bensel, of New York City (Larkin, Rathbone & Perry and W. Frederick Knecht, all of New York City, on the brief), for defendant Eastman and others.

Before SWAN, CLARK, and FRANK, Circuit Judges.

CLARK, Circuit Judge.

Plaintiffs appeal from a judgment dismissing on the merits complaints in two consolidated actions which they define as "of equitable cognizance" "charging conspiracy and fraud in the acquisition and execution of an agency." They are two of the three co-executors of the late Albert B. Shultz, who died in 1932, the third executor being the first-named defendant herein, Manufacturers & Traders Trust Company (the "Bank"). The suits grow out of the sale in September and October, 1928, by the stockholders of the Houde Engineering Corporation, of their stock in the corporation. Plaintiffs' testate, who participated in the sale, was president and principal stockholder of the corporation, owning 46 per cent of its common stock.

The defendants, in whose favor the judgment appealed from ran, are, in addition to the Bank, nineteen individuals, comprising the principal officers of the Bank (Harriman, president, Wurst, Rea, and Cantwell, vice-presidents), Cooley, a bank director and controlling proprietor of the New York Car Wheel Company, G. H. and H. L. Chisholm, both stockholders of Houde, G. H. being also Houde's vice-president, Sawyer, who acted as Cooley's lawyer, and, besides some others who need not be here described, the co-partners of the investment banking house of Eastman, Dillon & Co. All these were claimed to have been either active participants in the conspiracy or to have received some of the profits. They are the survivors of about thirty-five defendants who were sued originally, the remainder not having been served.[1] Among issues presented for decision herein are (a) whether an agreement of the stockholders of September 26, 1928, legally constituted the Bank their agent to sell the stock or, on the other hand, gave the Bank the option itself to purchase the stock at the agreed sum of $4,000,000, (b) whether, assuming the Bank was so made an agent of the decedent and the other stockholders, it was faithless to its trust, in that it conspired with other defendants named to sell to itself or its own designee with asserted large profits, (c) whether all important actions taken by the Bank and other defendants were unknown by the decedent either then or later and whether, if originally unauthorized, he ratified them by sharing in the proceeds and participating in other activities hereinafter described, and (d) whether all claims are barred by appropri-

---

[1] In Shultz v. Manufacturers & Traders Trust Co., 2 Cir., 103 F.2d 771, we dismissed an appeal from orders eliminating unserved defendants from the case and also striking parts of the complaint, 1 F.R.D. 53.

ate statutes of limitation, since the first of the two actions was not instituted until the fall of 1938, almost ten years after the transactions involved, or whether decedent never knew of the asserted fraud and plaintiffs remained ignorant of it until just shortly before the litigation was commenced.

After a lengthy trial on the merits the district court rendered a decision finding against the plaintiffs on all points, both of fact and of law. It ruled that the Bank took an option to purchase the stock and was not an agent, that in any event the successive sales of the stock were bona fide, without fraud or overreaching, that the decedent knew or had means of knowledge of all the important facts in issue and, moreover, took the fruits of the transactions, and finally that the actions were barred under the applicable statutes of limitation. The writer of this opinion is of the view that the facts found by the court were supported by the evidence which appears of record, and that from these facts as found the conclusions of the court followed. He therefore is prepared to accept the views of the district court in toto. But it is felt by the court as a whole that decision should follow more narrow lines where possible; and since the statutes of limitation are a complete defense, they will be stressed here, and facts appropriate to that issue will be particularly discussed. A fuller discussion of the background and of the events involved, together with quotation of the important documents, will be found in the opinion of the district court as reported in 40 F.Supp. 675-687.[2]

The transactions here brought up for re-examination disclose a not untypical American success story of the golden twenties. Prior to 1919, decedent acquired an exclusive license to the American patent rights for an automobile shock absorber invented by Maurice Houdaille of Paris, France. With an initial investment on his part of $30,000, he organized the Houde Engineering Corporation, which in 1928 was sold by him and his co-stockholders for an amount in excess of $4,000,000. His share of the sale price—excluding other profits, hereinafter noted—was $1,834,091.92 net after he had paid off a claim of other stockholders against him. This, however, did not exhaust the bonanza qualities of the stock,

which still grew in worth after the sale, so much so, indeed, that these and other lawsuits followed.[3] It was soon resold, as we shall see, by a syndicate in which decedent participated, for six million to a Michigan investment house, which proceeded to organize a new corporation and consolidate it with others. The shares of the new concern when offered to the public and traded in advanced so rapidly on the stock market that their paper value in a short time was asserted to be over fifteen million dollars. How much of this value vanished in the bleak depression days of the thirties does not appear. But these amounts show the richness of the prize. Plaintiffs value the loss to their estate at seemingly upwards of ten million dollars. But this is based on the extreme advance of the stock; the actual profits of the various participants were much less. It will appear, too, that decedent knew of the total amount of all these profits, and at most lacked complete knowledge only of their distribution and ultimate destination. And whether for good or ill, there can be no doubt that the Bank and its associates brought to consummation a disposal of these assets where previous efforts had failed. Their very success led ultimately to extensive claims against them.

Prior to the transactions directly in issue, several attempts had been made by decedent and others to dispose of the stock. Even though the company had achieved a moderate success, its working capital was insufficient and it was too dependent on patents which would soon expire. These efforts at disposition had been unsuccessful; but in the fall of 1927, Houde secured the contract of supplying shock absorbers for Ford, and its business, prospects, and asking price increased. Whereas formerly the stockholders had asked $2,400,000 and later $3,000,000—without, however, effectuating a sale—now they desired $4,000,000 for their holdings. Decedent had gone to France on company business in September, 1928, when Rea—vice-president of the Bank in charge of its securities department—having, as he thought, an opportunity of developing a sale of the company, sought an option on the stock. The result of various negotiations, in which decedent's interests were represented by defendant George H. Chisholm, co-officer and co-stockholder in Houde, as well as decedent's financial rep-

---

[2] For denials of summary judgment, see 1 F.R.D. 451 and 32 F.Supp. 120; for orders as to discovery, see 1 F.R.D. 243.

[3] Other lawsuits growing out of this transaction are cited in notes 5–8, infra.

resentative, led to the execution of the instrument of September 26, 1928, which is the prime source of confusion in this case.

By this document the signing stockholders of Houde (with Chisholm signing for decedent) "give to Krauss & Company [a partnership of junior bank officers actually representing the Bank] for a period of thirty days from the date hereof, the right to purchase all the stock, of the Houde Engineering Corporation at a price of ($4,-000,000) Four Million Dollars in total. This option can only be exercised by the payment of cash before its expiration." The word "option" was used a total of four times in the instrument, which, however, also contained this provision: "Inasmuch as Krauss and Company will act as a broker in this transaction, it is also understood that in the event of the sale of said stock being consummated Krauss and Company will be entitled to a commission from the purchase price of 3%." It was also provided that the net assets upon exercise of the option should be equivalent to those of August 31, 1928, and any accrual in them should "adhere to the vendors in this option," and that there should be a reduction of a proportionate amount per share for all shares up to 265 which the signing stockholders could not deliver.

After the signing of this document, and in order to make sure that Shultz was in accord, certain cablegrams between Chisholm in Buffalo and Shultz in Paris, France, followed; and these, being the first direct connection of Shultz with the transaction, naturally have been much discussed by the parties and the court. They, together with the original option instrument, will be found set forth at pages 679 and 680 of 40 F.Supp. Also there set forth is an acceptance of the option signed by Krauss & Company on October 11, 1928, directed to the Houde stockholders who had signed up, the first sentence of which reads: "Referring to the option dated September 26, 1928, which you have given us for the purchase of all of the stock of Houde Engineering Corporation, at a price of $4,000,-000.00, we beg to advise you that we have secured as a purchaser the New York Car Wheel Company, of this city, which has agreed to purchase said stock upon the terms of our option, and has made available in our hands the sum of $4,000,000.00 therefor." A copy of this letter, sent to Shultz by registered mail, was received by him upon his return from Europe on October 18, 1928.

The New York Car Wheel Company, referred to as the purchaser, was a company dominated by the defendant Cooley, a director of the Bank. The bank officers had succeeded in interesting Cooley in the purchase and he was the actual purchaser of the stock, although he preferred the transaction to appear in the name of his company. Since he was averse to making such heavy commitments, even though he was a man of means, he made an agreement with the chief bank officers, defendants Harriman, president, Wurst, executive vice-president, and Rea, whereby they agreed to take the commitment off his hands in the event of his death or disability and to form a syndicate to relieve him of a portion of the purchase if he so elected. It was stated to be the intention of the Car Wheel Company to have the syndicate relieve it of approximately $3,500,000 of the $4,000,000 commitment; further, that it seemed best not to form this syndicate for three or four days, "but the officials of the Trust Co. have signified their ability and readiness to do so." Harriman also agreed, on behalf of the Bank, to lend Cooley the money to purchase the stock upon deposit of the Houde stock and additional collateral to secure the loan. This agreement, reached on October 10, was reduced to writing on October 11, the day the Bank exercised the option. Since plaintiffs point to this instrument as showing that in substance the Bank, not Cooley, was the purchaser, it should be noted that these three individuals took only a contingent commitment, and that Cooley himself assumed no obligation at all to them.

Negotiations immediately took place with representatives of General Motors who visited the Houde plant on October 12 and conferred with the bank officials and with Cooley. This conference left little prospect of a sale to General Motors. On October 13, Cooley met with the three bank officers at the Bank and outlined in writing his intention with respect to the venture by reciting the purchase by the Car Wheel Company, "of which I own control," of the Houde stock at approximately $4,000,000 in accordance with the Krauss option; that the three bank men had agreed to relieve him of the obligation in case of death; and that negotiations were pending with a subsidiary of General Motors. Then he went

on to say that if these negotiations were successful it was his intention, after expenses were paid, to divide the net profits one-half to the Bank and its investment affiliate, 30 per cent to the three bank men, with Rea taking one-half this amount, and 20 per cent to himself. If, however, the sale was not consummated, it was contemplated that an underwriting syndicate be organized, wherein the net profits retained by Cooley should be divided 15 per cent each to Harriman and Wurst, 30 per cent to Rea, and 40 per cent to himself.

These two documents by Cooley of October 11 and 13 are particularly significant because, unlike substantially all the other documentary evidence in the case, the district court has found there was no evidence to show that decedent knew of either of them. But, as we shall see presently, he did know, and the court so found, that the Bank was loaning money to Cooley for his purchase. Hence this matter of the so-called concealed "kickbacks," referred to in the memorandum of October 13, and later paid, seems in essence the nub of plaintiffs' entire case.

When decedent returned from Europe on October 18, he thought the stock had been sold to General Motors, and was incensed, because General Motors was a large competitor of Ford. After being assured by the Bank that it had been sold to Cooley, he seems to have been not only satisfied, but rather anxious to put the deal through. Among other things, he arranged to buy off the Scully brothers, minority stockholders, who had not agreed to make the sale and who were objecting; and actually, by agreement, $50,000 was paid by Cooley on decedent's account to settle their claims. On October 24, the Bank loaned Cooley $2,-500,000 to pay for the stock; and, in addition to the Houde stock already delivered in escrow to the Bank, Cooley deposited collateral securities having a market value in excess of $600,000. Decedent, however, was not then paid in full; he received a total down payment from Cooley of $250,-000 and allowed the balance to stay due on demand, with interest, since interest would not be paid by banks on deposits until the first of the month. The Bank guaranteed the payment of this balance. All this appears from decedent's receipt dated October 24, 1928, a highly significant document.

In this document decedent acknowledged receipt from the Car Wheel Company, "by Fred B. Cooley," of $250,000 as part payment on $1,884,091.91 for his Houde shares "sold and delivered under the terms of an option dated September 26th, 1928, given to Krauss & Co., the three per cent (3%) commission allotted to the latter having been deducted from the sale price. The balance is to be paid to me on demand, except that I may be permitted to take stock of a new corporation in part payment of the balance. It is understood that I am repaying to Fred B. Cooley" the $50,000 paid by him to settle the Scully claims "against me." This shows, of course, familiarity with the original option, even to details such as the Krauss commission, and anticipation of future plans for the stock which might lead to the formation of a new corporation. Even more significant is the fact that underneath Shultz's signature is the statement, "We undertake to see that payments are made to A. B. Shultz, in accordance with the terms of the above receipt, on demand," signed by the Bank, by Wurst as executive vice president. As to this, Wurst testified to a conversation with decedent wherein the latter referred to an earlier conversation with Cooley— wherein Cooley had said he could borrow the money and pay decedent back at any time—and inquired in a half-joking manner how he would know the Bank would lend Cooley the money. So Wurst said, "I will fix that," and dictated and signed the undertaking.[4] From these facts the court quite properly found that decedent knew the Bank was financing Cooley's purchase and had made a loan to him in connection with it.

---

[4] This testimony was received over plaintiffs' objections based on New York Civil Practice Act § 347, the so-called dead man statute, excluding testimony of transactions with the deceased unless opened by the executors. The court held that this transaction had been so opened. Throughout the case plaintiffs objected to all conversations with decedent except such as they chose to open; and testimony from Chisholm, for example, concerning his conversations with decedent or, as here, bearing on the content of the earlier conversation with Cooley, was rigidly excluded. We have already commented on the effect of this statute, as preventing a full view of the facts, in Dellefield v. Blockdel Realty Co., 2 Cir., 128 F.2d 85.

894

Not having developed a purchaser, Cooley, with Harriman and Wurst, went ahead with the syndicate, except that now it was to take over the entire commitment at the price paid by Cooley for the stock. Subscriptions for the syndicate were taken from decedent, the Bank, its securities affiliate, the bank officers, and others. Although subscriptions generally had to be cut, decedent's own subscription of $250,000 was not reduced. The syndicate agreement, which he signed, recited the purchase of the stock by the Car Wheel Company for $4,000,000, plus accruals of income from August 31 to October 11 (as provided in the original option), and contained explicit provisions for the carrying out of the syndicate and the division of the assets and profits. As to the latter, it was provided that 25 per cent of any net profit resulting from the syndicate operation "shall first be paid to the New York Car Wheel Company, or its assigns, as its profit upon the sale of Houde Engineering Corporation stock in the Syndicate." Defendants rely upon this, in connection with the "kickbacks," as showing that decedent was perfectly willing that 25 per cent of the profit should be paid in substance to Cooley or to his assigns.

Actually, members of the syndicate were never called upon to pay the amounts subscribed by them or any amount, for on November 14, negotiations for a sale of the stock to Harris, Small and Company, an investment house of Detroit, Michigan, were opened, and on November 20, they were concluded by sale to this company of the stock for $6,000,000. The syndicate managers received the proceeds of the sale on December 3. They paid off the Bank's loan to Cooley and other expenses of Cooley and of the syndicate and distributed the balance as provided in the syndicate agreement. Decedent received as his portion thereof $76,942.39.

Decedent also received from the syndicate managers the balance due him from Cooley on the sale of his stock to Cooley, taking interest-bearing certificates of deposit from the Bank in place of Cooley's obligation, guaranteed by the Bank. The 3 per cent commission was paid to the Bank in the sum of $126,318.33 on or about December 5, 1928. At this time there was sent to Shultz by the syndicate managers, along with his check for the profits, a statement of the expenses of the syndicate and its net profit, which then continued: "By the terms of the underlying agreement. Mr. Cooley receives 25% of this sum which amounts to $436,006.88." And Shultz's portion of the profits was carefully figured out after deducting this profit to Cooley. Later, and about the first of the next year, Cooley paid Harriman, Wurst, and Rea the percentages of his profits which had been set forth in his statement of October 13. The Bank also gave the sum of $15,000 each to an Illinois bank (not a party here) and to defendants Eastman, Dillon & Co., in each case stating that it was in appreciation of their aid in negotiations, and not because of any obligation. The court found that the Bank was not obligated to make these payments, but that they were customary in the investment banking business, and that there was nothing improper about them.

Decedent continued as president of the Houde Company, his salary being increased from $20,000 to $25,000. He bought stock in the newly organized Michigan corporation and became a vice-president and director of it, remaining as such for some years. His relations with the other actors in this little drama remained always cordial; and when he died in 1932, he made the Bank a co-executor of his will, with large discretionary powers. During his lifetime he never made any complaint about the transactions here involved. After his death certain evidence as to the transaction appeared in a claim of the United States against the Chisholms for taxes,[5] and later in an unsuccessful suit by a minority stockholder of the Car Wheel Company on the claim that Cooley's transactions were not personal, but were for the benefit of that company.[6] Finally, certain minority stockholders of Houde brought suit against the Bank and others in litigation in the state courts, which extended for some time and was eventually decided adversely to them in 1938.[7] Plain-

---

[5] Chisholm v. Commissioner of Internal Revenue, 2 Cir., 79 F.2d 14, 101 A.L.R. 200, certiorari denied Helvering v. Chisholm, 296 U.S. 641, 56 S.Ct. 174, 80 L. Ed. 456.

[6] Goetz v. Manufacturers & Traders Trust Co., 248 App.Div. 665, 289 N.Y.S. 918.

[7] Shultz v. Manufacturers & Traders Trust Co., 249 App.Div. 88, 291 N.Y.S. 117; Id., 254 App.Div. 128, 5 N.Y.S. 2d 61, affirmed 279 N.Y. 781, 18 N.E.2d 865.

tiffs claim that this litigation for the first time brought to their attention the facts of an agency fraudulently executed and led to these actions.[8]

Some difference has developed between the parties as to the nature of these actions.[9] Defendants say that their entire basis is that of fraud and conspiracy, and that they are essentially actions for damages for deceit. Plaintiffs assert that, while they have shown such fraud, nevertheless the claimed fiduciary relationship of the Bank is sufficient to justify recovery of at least all the rewards and profits made by the parties hereto, even without a showing of definite fraud. They also assert that their suits are wholly equitable, a contention which has direct bearing upon the issue of the statutes of limitation hereinafter discussed. The district court, while finding against the plaintiffs generally, asserted that the action was one of fraud and suggested that it could not be changed to a different and inconsistent theory, namely, that of recovery on an implied obligation to pay over money received as a result of breach of trust and for restitution of profits. After a long and thorough trial we should not be disposed to hold the plaintiffs to any particular theory they may have set forth in their complaints, so long as the facts proven would justify recovery. We do not see, however, any difference in the result as between a claim for damages and a claim for restitution of profits. The bar of the statutes of limitation appears to be equally strong in either event.

The statutes applicable are state statutes of New York. Civil Practice Act § 48(1) allows six years for "an action upon a contract obligation or liability express or implied, except a judgment or sealed instrument"; (3) allows the same period to recover damages for a personal injury; and (5) allows the same time for "an action to procure a judgment on the ground of fraud," but it continues: "The cause of action in such a case is not deemed to have accrued until the discovery by the plaintiff, or the person under whom he claims, of the facts constituting the fraud." The action for restitution of profits or of unearned commissions has been held to come under (1), even if these were secret and unknown, and hence to require action within six years from the receipt of these sums by the defendant. Wechsler v. Bowman, 285 N.Y. 284, 34 N.E.2d 322, 134 A.L.R. 1337. As to any other claims not based on actual fraud, (3) would govern, even if the claims are unknown. Brick v. Cohn-Hall-Marx Co., 276 N.Y. 259, 11 N.E.2d 902, 114 A.L.R. 521; Adolf Gobel, Inc., v. Hammerslough, 263 App.Div. 1, 31 N.Y.S.2d 23. That is, except and unless plaintiffs can establish their claim of a planned fraudulent conspiracy here, their time for commencing action expired in 1934. Cf. Schmidt v. Merchants Despatch Transp. Co., 270 N.Y. 287, 300, 200 N.E. 824, 104 A.L.R. 450.

In this connection the case of Wechsler v. Bowman, supra, is persuasive. There defendants, who were real estate agents, made a secret agreement with one of several executors, in order to secure the agency to sell some land for the estate, that they would turn their fee back to this executor and meanwhile would collect another fee for themselves from the purchasers. This was done. The matter was not discovered by the remaining executors until more than six years had elapsed, when they brought suit. The court held unanimously that the agents had forfeited all claims for commissions, but that recovery for those retained by defendants was quasi-contractual in nature, being a claim for restitution, and had to be brought within six years. Such an action was subject to subdivision (1) of the statute, and hence was barred by lapse of time. The court further held, four to three, as to the commission obtained for the unfaithful executor, that this was a claim for damages for fraud (there being no benefits retained by defendants) and was not barred, because it had only lately been discovered. Our case as to benefits received is exactly similar to

---

[8] They first sought—unsuccessfully—the removal of the Bank as co-executor. In re Shultz' Will, 254 App.Div. 228, 5 N.Y.S.2d 190; Id., 254 App.Div. 928, 6 N.Y.S.2d 647; Id., 254 App.Div. 935, 6 N.Y.S.2d 647; Id., 255 App.Div. 751, 7 N.Y.S.2d 231; Id., 279 N.Y. 812, 18 N.E.2d 46. They also questioned the accounting for the estate in a federal suit, wherein we dismissed an appeal from a conditional order of intervention involv-

ing one of the present plaintiffs. Dolcater v. Manufacturers & Traders Trust Co., 2 Cir., 106 F.2d 30; Shultz v. Manufacturers & Traders Trust Co., D.C., 32 F.Supp. 120.

[9] The two actions which have been consolidated seem for all substantial purposes the same and have been so treated below; apparently they were brought to reach different parties.

the claim there held barred. Hence, unless a claim of fraudulent conspiracy lately discovered can be sustained, these actions, too, are barred.

■ With respect to the claim of fraud the district court made findings of fact, the nature 'of which we have indicated above. From these it concluded that "decedent had actual knowledge of the basic and material facts with respect to the Houde transactions sufficient to put him on inquiry and to start the Statute of Limitations running on the alleged claim based upon fraud." This conclusion seems amply supported by the facts we have set forth. From these it is clear that decedent was in possession of the essential facts of Cooley's and the Bank's participation in the disposal of the Houde stock, and was satisfied with the outcome. The only matter of any substance as to which evidence of his knowledge is here lacking,[10] is as to who Cooley's assigns were, among whom the latter's known profits were to be distributed. How far it was a matter of importance to him that Cooley, a bank director, as he knew, actually was going to divide his profits with other bank officials, Harriman, Wurst, and Rea, may be questioned. Be that as it may, the explicit finding of the court, which was in accord with all the direct testimony, was that this statement by Cooley of his intentions was not made until October 13, that is, not until two days after the sale to the Car Wheel Company was actually agreed upon. As the court found, these sums therefore had nothing to do with the sale. Hence at most they, like the commission paid the Bank, can only be benefits which the Bank, or its officers, might be obligated to return to its principal, if agency existed. But claims for these sums, as we have seen, are barred by the six-year statute. As to all other matters, these were so known to the decedent at or near the time of their happening that no conclusion of a concealed cause of action for fraud is justifiable.

It may be added that plaintiffs' claim of conspiracy depends on a highly involved series of inferences, all against the direct findings of the court. They think that a conspiracy of the bank officials and the investment brokers to get possession of the Houde stock, in order to turn it over for large secret profits, matured as early as July, 1928. Hence with decedent in Europe, and with Chisholm a co-conspirator, the opportunity arose. The Bank was an agent and a fiduciary, but nevertheless was the real purchaser of the stock and Cooley was only a front for the Bank. And hence the "kickback" arrangement must actually have been made sometime before the claimed sale of October 11 and as a part of the plan. And this conspiracy was carried out by the other steps leading to the disposal of the stock at an advance and division of the profits. And decedent never knew that the Bank, which was actually his agent, was thus constantly working against his interests. But the evidence does not afford a basis for these deductions, and the district court has found directly to the contrary.

■ Plaintiffs make two further claims based upon their contention that the complaints were "of equitable cognizance." They assert, as to equitable claims, either that Civil Practice Act § 53 applies, under which ten years are allowed for an action, "the limitation of which is not specifically prescribed in this article," or else that under Russell v. Todd, 309 U.S. 280, 60 S.Ct. 527, 84 L.Ed. 754, no state statute, but only the doctrine of laches, applies in a federal equity suit. The answer to these two alternative contentions is the same, namely, that no ground was shown here for purely equitable relief. As Russell v. Todd shows, the court was ready to accept an explicit applicable state statute to a suit of exclusively equitable cognizance, and further held that a suit even of an equitable nature brought in aid of a legal right follows the state statute of limitations as to such right—the same answer made under state law to the claim that the ten-year statute governs. Borst v. Corey, 15 N.Y. 505. Although plaintiffs have asked for an accounting, and added allegations in their complaints of an equitable nature, and although they now try to argue that such accounting is necessary because of the large number of defendants, it is quite clear that in no aspect can their case have any other than the two forms already discussed: (1) damages for injury because of an extensive conspiracy and fraud, or (2) a claim for restitution of profits made by various individuals at the expense of the decedent. New York law has always been quite definite that an equitable remedy is not to be had on a claim such as this against agents, even if an accounting is asked for; that a number of persons were involved cannot change the essentially legal nature of

---

[10] In general, declarations and statements of decedent were strictly excluded, on plaintiffs' objections. See note 4, supra.

the remedy or lift the bar of the statute. See, among others, Keys v. Leopold, 241 N. Y. 189, 149 N.E. 828; Carr v. Thompson, 87 N.Y. 160; Roberts v. Ely, 113 N.Y. 128, 20 N.E. 606, 22 N.Y.St.Rep. 185; Mills v. Mills, 115 N.Y. 80, 21 N.E. 714, 23 N.Y.St.Rep. 604; cf. Cwerdinski v. Bent, 256 App.Div. 612, 11 N.Y.S.2d 208, affirmed 281 N.Y. 782, 24 N.E.2d 475; Frank v. Carlisle, 261 App. Div. 13, 23 N.Y.S.2d 849, affirmed 286 N.Y. 586, 35 N.E.2d 932. There is nothing in the situation here disclosed to extend the time by virtue of unnecessary allegations incorporated in the complaint.

It follows, therefore, that the claims here made as against the Bank primarily and as against the other defendants, either as participating in the activities of the Bank or as taking profits belonging to plaintiffs' estate, are all barred under the applicable state statutes of limitation. The judgment is therefore affirmed.

FRANK, Circuit Judge (concurring).

I concur, but with the gravest doubts so far as the bank and its principal officers are concerned. Those doubts arise (a) from certain facts, not fully stated in the foregoing opinion, and (b) from the difficulty of interpreting Wechsler v. Bowman, 285 N. Y. 284, 34 N.E.2d 322, 134 A.L.R. 1337, as applied to those facts.

1. The bank's position in the sale of the Houde stock was, clearly, I think, solely that of selling-agent for the stockholders. The cases hold that a so-called "option" agreement, containing a provision for a commission to the person named as optionee, is ambiguous and may be nothing but an exclusive agency.[1] The bank itself contemporaneously construed this instrument as merely an agency agreement: One of its chief officers unequivocally testified, in earlier litigation, that, just after the agreement was signed, the bank decided that it gave the bank no right to purchase.[2] And, in that earlier litigation, there was no testimony that the bank had ever otherwise construed the agreement. Such sworn admissions are the most significant kind of testimony. Cf. Pence v. United States, May 11, 1942, 62 S.Ct. 1080, 86 L.Ed. ——. Moreover, the chief bank officers, at a time when they contemplated a sale to General Motors, after the so-called "option" agreement was signed, were fearful of objections by Shultz because he was friendly to Ford; had they thought the agreement gave the bank a right to purchase, they would not have been worried, since, if the bank had such a

---

[1] In Greenough v. Willcox, 238 Mich. 52, 213 N.W. 175, 177, the instrument was denominated by the parties to it as an "option" six times, and the agent was referred to as a "purchaser" the same number of times; yet the court said that under "the uniform holdings of this and other courts" the instrument created the relation of principal and agent. Citing this very case, the New York Appellate Division held in Shultz v. Manufacturers & Traders Trust Co., 254 App.Div. 128, 5 N.Y.S.2d 61, 62, that the instrument before us "did not confer on the defendant the right to purchase the stock," saying that the plaintiffs there had established that it "was a form of agency and not an option." See, also, the opinion of Story, J., in Doggett v. Emerson, 7 Fed.Cas. pages 804, 817, 818, No. 3,-960; Alger v. Keith, 6 Cir., 105 F. 105, 122, 123; cf. Reed v. Pitkin, 231 Mich. 621, 204 N.W. 750.

[2] Wurst, executive vice-president of the Bank, testified in an earlier case in 1935, as follows: "We had some discussion as to the nature of the option, of this option, as to whether it was an absolute option that could be enforced or whether it was a contract of agency that

could be withdrawn. The test I applied in my own mind and discussed about was as to whether we could become purchasers, and my judgment was that we could not."

In still another suit, in 1933, he testified: "The subject came up, I know, at the time, as to whether the Bank could exercise this option and we decided that we could not, that we could not buy it and still collect the commission for selling it. In other words, we could not be principals and agents both." He also testified thus at the same trial:

"Q. As I understood your testimony this morning, you said you thought your bank was acting as the agent for the sellers of the stock? A. That is correct. That is my view of it.

"Q. That is, they are acting as agents for the persons who entered into the option of September 26, 1928? A. That is correct."

And again:

"Q. You testified that the reason for your securing the New York Car Wheel Company was the fact that the bank was acting as the agent for the sellers? A. That is my understanding."

right, Shultz could not have objected to a purchase by the bank followed by re-sale to General Motors. A further indication that the agreement gave the bank no "option" to purchase is found in the New York Banking Law, which would have made such a purchase by the bank unlawful.[3] That Shultz, after he had been told that there had been a sale to the New York Car Wheel Company, signed papers referring to the exercise of the "option" has, I think, no significance; he had been previously told by one of his associates that the bank was to act as agent, so that his use, in those circumstances, of the ambiguous word "option" can be given no weight. Nor did the bank rely on his use of that word since, as above noted, its officers regarded the bank as merely an agent, not an optionee.

The bank, as agent to sell, was, therefore, under a fiduciary obligation not itself to become a purchaser, alone or in concert with anyone else, without the knowledge and consent of its principals. See, e. g., Commonwealth Finance Corporation v. McHarg, 2 Cir., 282 F. 560; 2 C.J. 695, 700, 701; 3 C.J.S., Agency, §§ 139, 144; Restatement of Agency, §§ 389, 390. That same obligation was, of course imposed upon its principal officers. Mechem, Agency, 2d Ed., §§ 1208 (note), 326, 333. An agent is responsible for the conduct of such sub-agents. Restatement of Agency, § 406. And it is well settled that where the agent violates such an obligation, the principal can recover the commission he paid the agent. Mechem, loc. cit., § 2477; Restatement of Agency, § 399 (cf. §§ 13 and 388). This is true, regardless of whether the principal suffered any financial loss from the transaction. In rejecting the defense that the agent acted in good faith and that his breach caused the principal no damage, Judge Cardozo, in Wendt v. Fischer, 243 N.Y. 439, 443, 444, 154 N.E. 303, 304, quoted the language of Judge Andrews in Munson v. Syracuse, G. & C. R. Co., 103 N.Y. 58, 74, 8 N.E. 355, to the effect that the law "does not stop to inquire whether the contract or transaction was fair or unfair." Cf. United States v. Carter, 217 U.S. 286, 287, 305, 30 S.Ct. 515, 54 L.Ed. 769, 19 Ann.Cas. 594, and cases there cited. Thus the purchase is improper even if the principal has authorized sale at a fixed price. Meek v. Hurst, 223 Mo. 688, 122 S.W. 1022, 135 Am.St.Rep. 531; Merriam v. Johnson, 86 Minn. 61, 90 N.W. 116. See, also, City of Findlay v. Pertz, 6 Cir., 66 F. 427, 434, 29 L.R.A. 188, by Lurton, C. J.; Mechem, Agency, 2d Ed., § 1199 (cf. §§ 1225, 1226, 1227).

It is, therefore, of the highest importance that the sale to Cooley was, in fact, a sale to the principal bank officers and Cooley. Before Cooley obligated himself to purchase, those bank officers had agreed to relieve him of $3,500,000 of the $4,000,000 purchase price. A memorandum signed October 11, but embodying terms settled upon on October 10, "in order to induce him (Cooley) to make such purchase (of the Houde stock),"[4] provided that Harriman, Rea and Wurst would take over Cooley's entire commitment in the event of his death or disability, and that they were presently able and ready to organize a syndicate to "relieve" Car Wheel of approximately $3,500,-000 of the purchase, although the formation of the syndicate was put off for three or four days. Those officers were thus, wrongfully, purchasers to the extent of seven-eighths of the price. Their position as co-purchasers was never disclosed to Shultz, plaintiff's decedent. He was informed that "we have secured as a purchaser the New York Car Wheel Company." True, he knew that that company was, in fact, Cooley, and that the bank had loaned Cooley the money to complete the purchase. But there was never a word said to Shultz as to the large participation of the other officers.[5] The situation is the same as if the bank itself, an agent to sell, had secretly participated in the purchase. In the circumstances, the bank forfeited its right to the agent's commission of $120,000 which it received,

[3] In 1928, § 190(9) of the New York Banking Law, Consol.Laws, c. 2, As Amended by Laws 1926, c. 259, forbade a trust company to invest more than 10% of its capital and surplus in the stock of private corporations. Under this limitation, the bank could not have put more than $1,500,000 into Houde stock.

[4] Quoted from finding 58.

[5] Subsequent reference to Cooley's "purchase," by failing to mention the position of Harriman, Rea and Wurst, may well have aided to keep Shultz in the dark. Thus, on November 14, when he was given his allotment in the syndicate's operation, he was informed that he need not put up any cash until requested and that "in the meantime, Mr. Cooley will continue to carry the stock." And when the syndicate profits were divided on December 5, reference was made to a purchase from Mr. Cooley, without mention of his co-adventurers.

and Shultz had a cause of action for the recovery of his share of this amount plus interest. [6]

It is true that Shultz knew that the bank's officers joined in the subsequent purchase, purportedly and so far as he knew a purchase from Cooley alone. But he had been led by the bank to believe that there had previously been a sale to Cooley, i. e., that the bank's agency had thus previously been terminated by performance of the agency. Once an agent to sell has ended his agency through proper performance, he is, of course, free of all obligations. He can then buy from the purchaser. Shultz' knowledge of, and acquiescence in, a participation by the bank's officers in the purchase from Cooley was, therefore, not knowledge of or acquiescence in the unlawful participation by them in Cooley's earlier purchase from Shultz. The New York rule is that "if dual interests are to be served, the disclosure to be effective must lay bare the truth, without ambiguity or reservation, in all its stark significance." Cardozo, J., in Wendt v. Fischer, supra.

It will not do to say that because Shultz approved a purchase by Cooley, a director of the bank, he could not have objected to the bank's chief officers joining in that purchase. Even assuming that Cooley, although not an active bank officer but merely a bank director, could not properly have purchased without Shultz' consent, it does not follow that a consent to a purchase by Cooley carried with it a consent as to any purchase by any active bank officer, which, without Shultz' consent, would have been wrongful. A principal might tell his selling agent that he will accept the agent's son as purchaser; that would not authorize a concealed sale through the son to the agent himself. And the great care with which the participation of the chief officers in the purchase was concealed from Shultz—it being, throughout, made to appear to be solely a sale to Cooley—serves to show that these officers were well aware of the impropriety of that participation.

2. There was another aspect of these transactions which illuminates the im-propriety of that secret participation in Cooley's purchase and which also gave rise to another cause of action: Cooley made a secret deal with the bank's chief officers to pay them 60% of his net profits on a resale by him. They secretly received that percentage—in the amount of $261,604.12. It is of no significance whether this secret deal was made at the time when these officers agreed to become joint purchasers with Cooley or two days later; for the details of the arrangement as to the precise share of the profits to be received by each of the several joint purchasers was but incidental to the previous secret agreement for the joint purchase. Shultz could have recovered his share of the $261,604.12 secretly paid to those officers, pursuant to that arrangement, with interest.

What I have said above as to Shultz' lack of knowledge or acquiescence in the officers' participation in the purchase is applicable to his alleged knowledge or acquiescence in those officers' share in the profits. He knew that they participated in the syndicate, but at that time he thought the sale to Car Wheel—and therefore the agency—had been completed; accordingly, his knowledge that they took part in and profited by the later syndicate operations was no condonation of the impropriety in profiting from the earlier sale. Much is made of the fact that he knew that the net profits—the 25%—were to be paid to Car Wheel's "assigns." But that was an apt word to describe those legitimately interested in Car Wheel. In fact, and as Shultz knew, the 25% was paid to Cooley as an "assign" of Car Wheel. But what Cooley, the "assign," had agreed to do and did do with those profits, when received by him, was elaborately concealed: At the suggestion of the bank officials who were his secret joint adventurers, Cooley went to a bank in another city (a bank with which he had never before dealt); there he deposited the 60% of the 25% profit, and procured cashier's checks for that amount which he then secretly distributed to those officials. [7]

3. It is argued that the findings of the trial court stand in the way of the version of the facts above narrated. I do not agree,

---

[6] As he was a 46% stockholder, he was entitled to recover 46% of this sum.

[7] Evidence of the manner in which certain of these defendants moulded their testimony to suit the occasion is found in their sworn statements in other lawsuits as to receipt of these amounts from Cool-ey. Thus the record in the case at bar shows that on the trial of the stockholders' suit brought by Goetz against the bank (see Goetz v. Manufacturers & Traders Trust Co., 248 App.Div. 665, 289 N.Y.S. 918), Wurst testified that neither he nor the other defendant bank officers

and for these reasons: The testimony of the bank officers that, when the sale to Car Wheel occurred, they construed the "option" agreement as creating merely an agency and as giving the bank no right itself to purchase, was given in trials of earlier suits. We are in as good a position to weigh that testimony as was the judge below, for neither he nor we heard that testimony given. He did hear the lame testimony in the trial of this case in which an effort was made to explain away those earlier solemn admissions under oath. [8] As those explanations were hopelessly inadequate, we can say that the findings on the point are clearly erroneous. And to do so is peculiarly justifiable here: The findings are unusually detailed; they consist of 41 printed pages comprising 239 separately numbered clauses, and go into the minutiae of much of the testimony. Yet, despite that elaborate detail, there is not the slightest mention of the significant former testimony, either in the findings or in the accompanying 24-page opinion. Nor do the findings or opinion of the trial judge so much as mention the unpleasantly evasive method used to conceal the secret payments to the bank officers.

It has often been held—and especially where the crucial testimony was given at former trials or in depositions—that an upper federal court may regard the findings of a trial court as clearly erroneous because patently against the weight of the testimony. [9]

had received any proceeds of the sale of Car Wheel except under the syndicate agreement.

In a deposition offered in the same case, Rea, while admitting when pressed that he had received the $130,802.06, said that "it was a very generous gift from Mr. Cooley to me." Yet in a verified petition to the Board of Tax Appeals he asserted that the sum was income received as the profit of a syndicate operation, and made no claim that it was a gift.

On a motion for summary judgment in the case at bar, Babcock, the bank's general counsel, stated in an affidavit that "the evidence is absolutely conclusive" that there was no agreement in advance that Cooley would pay these sums.

Harriman, in a similar affidavit, said that it was only when the proposed Eastman, Dillon deal to finance the resale had collapsed, that Cooley "stated for the first time" that he would share in profits with Harriman, Rea and Wurst. Yet Harriman later testified on the trial that the Eastman, Dillon plan was not dropped until the end of October and that the agreement to pay a share of the profits to the bank officers was made on October 13.

8 " 'Afterthought' is a word commonly used by judges to designate testimony that labors under grave suspicion because, if it were true, the party's neglect to produce it at an earlier stage * * * is a singular oversight," writes Moore in his invaluable treatise, Facts. "Thus it often happens on new trials * * * that a party changes his testimony to meet the varying fortunes of the case. Although such testimony must be submitted to the jury subject, however, to the power of the trial court or of an appellate court to review the evidence to grant a new trial because of a verdict against the evidence, judges usually express a strong feeling that no dependence can be placed upon the testimony which has thus been changed to meet the views of the court which reversed the original judgment. For similar reasons, distrust attaches to new evidence introduced on appeal in admiralty cases, to alleged newly discovered evidence on a motion for new trial, or on a bill of review, to testimony given by a witness on his re-examination, and generally to evidence tardily introduced after a party has had an opportunity to mould it into conformity with altered circumstances of his case." Many courts have said that where a witness gives testimony which contradicts his prior testimony under oath, his evidence is unworthy of credit. "A witness who has had ample opportunity to narrate his connection with a transaction, and apparently fully relates the same, and thereafter, in another litigation, gives a different narrative in relation thereto, or one from which an entirely different inference may be drawn, is not usually to be depended upon for accuracy of statement." Moore, Facts, § 1132, cf. §§ 757, 1079.

I think that the testimony given in the instant case by the defendant bank officers is not worthy of belief. But I am not to be taken as saying they were guilty of perjury. I should rather (to quote Mr. Justice Baldwin) call their testimony "latitudinarian." Poole v. Nixon, 19 Fed.Cas. at pages 992, 996, No. 11,270.

9 State Farm Mutual Automobile Ins. Co. v. Bonacci, 8 Cir., 111 F.2d 412, 415; Fleming v. Palmer, 1 Cir., 123 F. 2d 749, 751; Equitable Life Assur. Co. v. Irelan, 9 Cir., 123 F.2d 462, 464; United States v. Anderson Co., 7 Cir.,

As to whether the arrangement between Cooley and the bank officers constituted a joint purchase, there is no dispute in the testimony but only as to the inferences to be drawn therefrom. We are as free as the trial judge, in such circumstances, to draw such inferences.[10]

4. It seems to me, then, that there were two clearly valid causes of action: (a) one for the recovery of the secret profits ($261,604.12, and interest) and (b) one for the recovery of the commission ($120,000, and interest).[11]

5. The facts on which these two causes of action rest were unknown to Shultz and were only recently learned by plaintiffs, his representatives. But in Wechsler v. Bowman, supra, it was held (following earlier New York decisions) in a suit against brokers authorized to sell, that an action to recover from them secret profits (in that case commissions secretly paid to them by the purchaser) sounded in quasi-contract rather than in fraud. The six-year period prescribed by § 48(1) of the New York Civil Practice Act was accordingly held applicable. It bars recovery here for the secret profits, without regard to plaintiffs' lack of knowledge of the facts underlying this claim.

But Wechsler v. Bowman, supra, is not entirely clear as to whether the cause of action to recover back the commission paid by the seller, the principal, to the agent, is in quasi-contract. If it is for fraud, the action was timely, for the statute does not begin to run until discovery of the facts constituting the fraud. Civil Practice Act § 48 (5). In the Wechsler case [285 N.Y. 284, 34 N.E.2d 327, 134 A.L.R. 1337], the commissions which the principal paid, and later sought to recover, were not retained by the faithless agents, but were paid over by them to a third party. The court held the action for the recovery of the commissions to be in fraud rather than in contract, saying: "Under such circumstances, no implied contractual obligation arises since 'the offender acquires no gain to himself * * *' and his estate is not enriched. Lord Mansfield in Hambly v. Trott, 1 Cowp. 372." Although puzzled, I incline to think this is an implied holding, by way of dictum, that if those commissions had been retained by the agents, the action would have been in contract and, therefore, subject to the bar of the Civil Practice Act § 48(1), under which no significance attaches to the plaintiff's knowledge or ignorance of the facts. Applying the same principle to the case at bar, the cause of action for the commission paid to the bank would also be barred. I say this with hesitation, because it rests not upon a flat holding in Wechsler v. Bowman, but upon a dictum consisting of an implication from the opinion.

It is an implication, furthermore, which leads to an incongruous result. For I can find no more rational basis for applying the statute of limitations to a case where the agent has retained the commissions received from his principal than to a case where he has paid those commissions over to another. The principal's opportunity to discover the impropriety would seem to be as great in one case as in another; yet Wechsler v. Bowman appears to say that the time of discovery is significant only if the agent fails to retain the commissions received when he was unfaithful.[12]

---

119 F.2d 343, 346; Wigginton v. United Commercial Travelers, 7 Cir., 126 F.2d 659, 661; United States v. Mammoth Oil Co., 8 Cir., 14 F.2d 705, 717, 718; Levy v. Weinberg & Holman, Inc., 2 Cir., 20 F.2d 565, 567; cf. MacGowan v. Barber, 2 Cir., 127 F.2d 458, 461.

[10] Valentine v. Chrestensen, April 13, 1942, 62 S.Ct. 920, 86 L.Ed. ——; Kuhn v. Princess Lida, 3 Cir., 119 F.2d 704, 705, 706; United States v. South Georgia R. Co., 5 Cir., 107 F.2d 3; United States v. Mitchell, 8 Cir., 104 F.2d 343, 346; Midwood Associates, Inc., v. Com'r, 2 Cir., 115 F.2d 871, 872; Com'r v. Buck, 2 Cir., 120 F.2d 775, 779; Kycoga Land Co. v. Kentucky River Coal Corp., 6 Cir., 110 F.2d 894, 896; United States v. Anderson Co., supra; Wigginton v. United Commercial Travelers, supra.

[11] As above noted, Shultz as a 46% stockholder would have been entitled to 46% of those respective sums.

[12] I would perhaps regard this apparent distinction as the result of a misreading of Wechsler v. Bowman, if it were not for the fact that a contrary reading would be equally incongruous. For, if the opinion were interpreted to mean that, even if the commissions had been retained by the faithless agents, the statute begins to run only upon discovery, there would be a distinction, so far as the statute of limitations is concerned, between this situation and the case of commissions paid by the principal, where time of discovery is irrelevant. This distinction would be illogical, since there seems to be no greater likelihood of discovery in one case than in the other;

I am, therefore, inclined to believe that, in the case at bar, the plaintiffs' cause of action both for the secret profits and the commission paid to the bank by the principal is, under the rationale of the Wechsler case, barred by § 48(1) of the New York Civil Practice Act. Yet I should not be surprised if the New York courts, in some later case, should hold that this conclusion is wrong with respect to commissions paid by the principal in such circumstances as are found here, or if the United States Supreme Court, should it review our decision, were to hold that we had misunderstood the Wechsler case.

---

in fact, in Wechsler v. Bowman itself, the cause of action for the commissions paid by the principal rested on the same facts as the cause of action for the commissions paid by the purchaser, so that discovery of the facts giving rise to ei-

ther cause of action necessarily gave rise to knowledge of the other. But it was held that one must be brought within six years of the operative facts, while the other dated only from discovery of these facts.